**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**




ATTORNEY FOR APPELLANT:

**DAVID A. BROWN**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF M.P., MINOR CHILD, AND HER FATHER M.J.P.,

M.J.P.,

Appellant-Respondent,

vs.

INDIANA DEPARTMENT OF CHILD SERVICES,

Appellee-Petitioner.

No. 02A03-1309-JT-388

---

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
The Honorable Lori K. Morgan, Magistrate
Cause No. 02D08-1212-JT-143

---

**April 16, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

## CASE SUMMARY

Appellant-Respondent M.J.P. ("Father") appeals the juvenile court's order terminating his parental rights to M.P. The Department of Child Services ("DCS") removed M.P. from Father's care after receiving a report that Father was unable to provide appropriate care for M.P. because Father and K.C. ("Mother") were allegedly involved in a domestic dispute and Father, M.P.'s custodial parent, had been arrested. On appeal, Father contends that DCS did not provide sufficient evidence to support the termination of his parental rights. Concluding that the evidence was sufficient to support the termination of Father's parental rights, we affirm.

## FACTS AND PROCEDURAL HISTORY

M.P. was born to Father and Mother on March 24, 2009.[1] DCS became involved with the family after receiving a report on or about February 26, 2012, that Father was unable to provide appropriate care for M.P. because Father and Mother were allegedly involved in a domestic dispute and Father, M.P.'s custodial parent, had been arrested. The report also indicated that both Father and Mother refused to take a drug screen.

On February 28, 2012, Father appeared at a preliminary inquiry hearing wherein the juvenile court found probable cause to believe that M.P. was a child in need of services

[1] The termination of Mother's parental rights is not at issue in this appeal.

("CHINS") and authorized DCS to file a CHINS petition. On March 26, 2012, DCS filed an amended verified CHINS petition. Following an evidentiary hearing, on May 24, 2012, the juvenile court adjudicated M.P. to be a CHINS. The juvenile court also issued a dispositional order and parental participation decree in which it ordered Father to complete certain services.

The juvenile court conducted a periodic review hearing on June 26, 2012, at which it found that Father had tested positive for cocaine on June 12, 2012. The juvenile court also modified Father's parental participation plan, ordering Father to complete a psychological evaluation. On September 12, 2012, the juvenile court denied a motion by Father to have M.P. returned to his care. Following an October 31, 2012 permanency review hearing, the juvenile court found that while Father had regularly visited M.P., Father had (1) failed to complete the domestic violence services, (2) failed to attend a child and family team meeting, (3) tested positive for illegal substances, and (5) not demonstrated an ability to benefit from services. The juvenile court also approved the change of the permanency plan from reunification to termination of Father's parental rights and adoption.

On December 11, 2012, DCS filed a petition seeking the termination of Father's parental rights to M.P. On May 15, 22, and 29, 2013, and June 5 and 6, 2013, the juvenile court conducted an evidentiary termination hearing at which Father appeared and was represented by counsel. During the termination hearing, DCS introduced evidence relating to continued concerns regarding Father's inability or refusal to properly care for M.P. and his failure to participate in or benefit from the services offered by DCS. This evidence included

evidence that Father had tested positive for illegal drugs on numerous occasions, failed to acknowledge any prior domestic abuse between himself and Mother, and missed numerous visitation and counseling sessions. DCS also introduced evidence indicating that the termination of Father's parental rights was in M.P.'s best interests and that its plan for the permanent care and treatment of M.P. was adoption. Father presented evidence which he claimed demonstrated that he was beginning to make progress and, as such, should be given more time before his parental rights were terminated. Following the conclusion of the termination hearing, the juvenile court terminated Father's parental rights to M.P. Father now appeals.

**DISCUSSION AND DECISION**

The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly

harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

Father contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating his parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id*. Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*.

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id*. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id*. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id*.

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following exists:
> > (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
> > (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable

efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2011). Specifically, Father claims that DCS failed to establish that there is a reasonable probability that either (1) the conditions that resulted in M.P.'s removal or the reasons for M.P.'s continued placement outside of his care will not be remedied, or (2) that the continuation of the parent-child relationship poses a threat to the well-being of M.P.

**Conditions Resulting in Removal Not Likely to Be Remedied**

On appeal, Father argues that DCS failed to establish by clear and convincing evidence that the conditions resulting in M.P.'s removal from and continued placement outside his care will not be remedied. Father also argues that DCS failed to establish by clear and convincing evidence that the continuation of the parent-child relationship poses a threat to M.P. However, it is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is

written in the disjunctive, the juvenile court need only find *either* that the conditions resulting in removal from or continued placement outside the parent's home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the child. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where, as here, the juvenile court concludes that there is a reasonable probability that the conditions which resulted in the removal of the child from or the reasons for the continued placement of the child outside of the parent's care would not be remedied, and there is sufficient evidence in the record supporting the juvenile court's conclusion, it is not necessary for DCS to prove or for the juvenile court to find that the continuation of the parent-child relationship poses a threat to the child. *In re S.P.H.,* 806 N.E.2d at 882.

In order to determine whether the conditions will be remedied, the juvenile court should first determine what conditions led DCS to place M.P. outside of Father's care or to continue M.P.'s placement outside Father's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.,* 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.,* 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside her parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for his child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. A

juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Here, the juvenile court determined that DCS presented sufficient evidence to prove that it was unlikely that the reasons for M.P.'s removal from and continued placement outside of Father's care would be remedied, and upon review, we conclude that the juvenile court's determination to this effect is supported by the record. In support of its determination, the juvenile court found as follows:

> It is established by clear and convincing evidence that the allegations of the Petition are true in that there is a reasonable probability that the conditions that resulted in [M.P.'s] removal and the reasons for the placement outside [Father's] home will not be remedied, and/or that continuation of the parent/child relationship poses a threat to the well-being of [M.P.].
>
> At the time that the proceedings began in the underlying CHINS case in February of 2012, there were concerns about incidents of domestic violence occurring between [Mother] and [Father], and there were concerns about drug usage by the parents which behaviors interfered with their ability to properly parent [M.P.] and interfered with their ability to provide her with a safe, stable home environment.

After the initiation of the CHINS proceedings, [DCS] made referrals for the parents that were designed to assist them in remedying the reasons for removal of the child from the home.… [DCS] made referrals for [Father's] participation in services that were designed to assist him in remedying the reasons for removal of [M.P.] from the home. Specifically, they made a referral to the Center for Non Violence for [Father's] participation in non-violence counseling to address the issues of domestic violence that have occurred between [Father] and [Mother]. [Father] has failed to participate in non-violence counseling through the Center for Non Violence. He attended an orientation session on September 11, 2012, and scheduled an intake conference for October 5, 2012. He failed to call or appear for the scheduled intake conference on October 5, 2012. He then rescheduled his intake appointment two additional times. Ultimately, he did attend an intake appointment, however, he claims that he was unable to enroll in services because they required him to admit that he had battered [Mother] on February 26, 2012, and he contends that he did not batter [Mother] on that day. The Center for Non Violence's representative testified that [Father's] representation is incorrect. The program requires a person to be able to acknowledge that an act of violence has occurred at some point in their lifetime. [Father] was convicted of committing a battery upon [Mother] in 2010, and could have acknowledged that act and been admitted into the program. Unfortunately, during his intake session [Father] informed the center representative that he had never used any violence in his relationship with [Mother] and informed them that he had not participated in any acts of violence since he was eighteen years old. These statements clearly contradict his testimony at trial which revealed that he had a 2001 battery conviction and that he was convicted of [b]attery to [Mother] in 2010.

The [DCS] case manager made a referral to the Bowen Center for [Father's] participation in therapy. [Father] did not initiate services until January of 2013, when he participated in an interview with the therapist. After the interview, the therapist opined that [Father] met certain criteria for a diagnosable mental health need. He diagnosed [Father] with Adjustment Disorder with mixed disturbance of conduct and emotion. He further noted that [Father] suffers from mood related issues and depression combined with anxiety over life's stressors. He has observed that [Father] has exhibited signs of restlessness, fidgeting, thinking errors, confusion, and difficulty concentrating and noted that [Father] was not self-aware. When he asked [Father] whether he was using drugs, [Father] denied current use, but acknowledged that he had a history of drug and alcohol abuse. At trial, the therapist has advised that if he had been aware that [Father] had been using

drugs, he would have referred for additional services that would have included drug and alcohol counseling. He did refer [Father] for an appointment with a chemical dependency specialist and [Father] scheduled the appointment, however, later cancelled it. He and [Father] were to meet on a bi-weekly basis and had scheduled two appointments in February of 2013, two appointments in March of 2013, and two appointments in April of 2013. [Father] only met with him one time in the month of February 2013, and one time in the month of March 2013. He did meet with the therapist two times in the month of April 2013. The therapist advised that the first four sessions with [Father] mostly centered on rapport building but that they did not begin working on anxiety issues. They have not worked on parenting, communication, anger management, or other issues. The therapist opined that [Father] would require therapy for some time. [Father] has not been forthright with [DCS] or his counselor about his drug use and therefore, cannot receive a full benefit from services and cannot achieve sobriety until he is willing to acknowledge his addiction and seek treatment for it.

[DCS] made a referral to SCAN for [Father's] participation in supervised visits. [DCS] made a referral for supervised visits in February of 2012, however, the referral was closed on April 24, 2012, because [Father] was incarcerated. SCAN received a second referral from [DCS] on May 14, 2012. There were forty-two scheduled visits and [Father] failed to show for nine of the scheduled visits. At the time of the hearing on the Petition for Termination of the Parent/Child Relationship, his visits had been placed on hold for missing two visits in April of 2013. His last visit with [M.P.] was on April 15, 2013, and he missed the visits scheduled for April 22, 2013, and April 29, 2013. During the time that [Father's] visits with SCAN were supervised, one caseworker requested to be reassigned from his case in July of 2012, because [Father] was crossing boundaries and told her that he wanted to become involved in a relationship with her. A second worker asked to be transferred from his case in October of 2012, because [Father] was yelling at her a lot after the visits and the office staff was concerned for her safety. When he was yelling at her, [Father] would tell her that he knew how to parent his child and did not need her help.

As part of the Court's Dispositional Order, [Father] was ordered to refrain from consumption of alcohol, illegal drugs, and other substance abuse and to submit to random urinalysis testing, drug screens and/or oral swab testing as required by [DCS] caseworkers. The [DCS] caseworker attempted to test [Father] a few times per month, however, when she would contact him and request that he come to her office within 24 hours to submit to an oral swab test, he would not always come in stating that he was out of town working.

[Father] tested positive for cocaine and opiates on January 2, 2013, and opiates on January 12, 2013. He tested positive for cocaine and heroin on two occasions in April of 2013. At trial, he acknowledged that he had a positive screen for cocaine in the spring of 2012, however, advised that he believed that the test was positive because he was taking Benzocaine and Lidocaine for his tooth pain at the time of the test and that those substances caused him to have a positive result for cocaine. Bridget Lemberg, the lab director and toxicologist for Forensic Fluids Laboratory, the lab that performed the testing on the oral swabs submitted to them by [DCS], provided testimony at trial that refutes [Father's] assertion that his use of a pain killer for his teeth caused him to test positive for cocaine. She advised that no two drugs have the same chemical make-up and that no other drug would cause a person's oral swab test result to reveal a positive result for an illegal drug other than the illegal drug itself. In other words, she advised that the use of Benzocaine would show a positive result for the chemical make-up of Benzocaine and not for cocaine. She further advised that foreign substances in a person's mouth such as a breath spray would not affect the accuracy of a test result. She advised that the use of adulterants may alter a person's test results however, it would cause the person's test results to be negative for the use of illegal substances and not positive.

Both parents allege that part of the reason for their delay in initiating services is that the first [DCS] case manager did not make referrals in a timely manner. The record at trial is unclear as to whether this was true, however, when [DCS] case manager, Julie Finn, was assigned to the case in June of 2012, she ensured that all necessary referrals had been made. Despite her efforts, … [Father] did not initiate counseling services until January of 2013.

At the time of the initiation of the underlying CHINS proceedings, the parents were in need of services to assist them in addressing issues of domestic violence and substance abuse. In the underlying CHINS proceedings, referrals were made to assist the parents in addressing these issues, however, the parents failed and refused to participate in services or enrolled in the services just prior to the hearing on the Petition for Termination of the Parent/Child Relationship. The parents continued to test positive for illegal drugs during the underlying CHINS proceedings which drug usage will likely impact their ability to provide for the necessities of a suitable home for the raising of [M.P.] They continued to deny and/or minimize domestic violence issues during the underlying CHINS proceedings and failed and/or refused to participate in services to address this issue.

Accordingly, the Magistrate finds that [DCS] has proven by clear and

> convincing evidence that there is a reasonable probability that the conditions that resulted in [M.P.'s] removal from the home will not be remedied and/or that continuation of the parent/child relationship poses a threat to the well being of the child.

Appellant's App. pp. 9-13. In light of these findings, the juvenile court concluded that DCS established by clearing and convincing evidence that the reasons for M.P.'s removal from and continued placement outside Father's home would not be remedied.

In challenging the juvenile court's findings, Father points to facts which he claims support the determination that he had made progress in remedying the conditions that led to M.P.'s removal from and continued placement outside his home. However, despite Father's claim to the contrary, upon review, we conclude that the evidence presented during the termination hearing supports the juvenile court's determination. The record reveals that Father was offered various services but his participation in and successful completion of said services was incomplete. In addition, it appears from the record that Father has failed to acknowledge issues relating to allegations of domestic abuse and his seemingly-ongoing drug use.

With respect to treatment for alleged domestic violence against Mother, the evidence demonstrates that Father was referred to a program at the Center for Non-Violence. In order to be admitted to this program, Father was required to admit that he had used violence, *i.e.*, "words or actions that cause fear or harm to another individual," at some point during his adult life. Tr. Vol. 1, p. 31. Father refused to do so and claimed that he had never used violence against Mother. However, Father subsequently admitted during the fact-finding

hearing that he was convicted of misdemeanor domestic battery against Mother in 2010. Father also acknowledged that he had two prior misdemeanor battery convictions from 2000.

Father claimed that he "had a great relationship" with Mother despite the fact that she had allegedly lied in making the February of 2012 abuse allegation. Tr. Vol. 1, p. 174. The record reveals that Father has a history of failing to complete court-ordered non-violence classes and that he does not believe that he needs assistance in addressing his issues with violence. Father testified during the fact-finding hearing that he and Mother were attempting to "rekindle their relationship." Tr. Vol. 1, p. 189. He also acknowledged that he had been arrested and was about to face trial for "harboring a fugitive" because police had found Mother hiding in his home in March of 2013. Tr. Vol. 1, p. 181.

With respect to the court-ordered therapy, the record reveals that Father began to meet with Roy Payne at the Bowen Center beginning in January of 2013. At that time, Payne observed that Father displayed a "considerable amount of anxiety and stressors." Tr. Vol. 1, p. 48. Father was diagnosed with "Adjustment Disorder with Mixed Disturbance of Mood and Conduct or Emotions and Conduct." Tr. Vol. 1, p. 48. As of the date of the fact-finding hearing, Father's therapy had not yet addressed any issues relating to parenting, Father's communication issues, or Father's history of domestic abuse. Payne indicated that he expected Father to be in therapy "for some time." Tr. Vol. 1, p. 62. Payne could not say that Father's mood disorder would not potentially be a threat to M.P.'s well-being because symptoms and behaviors manifest differently in different individuals. Payne acknowledged

that Father had missed two of the first six scheduled appointments and had only completed the rapport building phase of treatment as of the date of the termination hearing.

With respect to visitation and completion of the court ordered services, the record reveals that out of the forty-three visits with M.P. scheduled from May of 2012 to May of 2013, Father failed to attend nine visits and three were canceled. The first visitation supervisor assigned to work on Father's case requested to be transferred from Father's case because Father indicated that he wanted to engage in a relationship with her and showed a lack of respect for the boundaries for interaction set by the visitation supervisor. The second visitation supervisor assigned to work on Father's case also requested to be transferred from Father's case because Father yelled at her multiple times after visits and displayed "a lot of hostility" toward her. Tr. Vol. 1, p. 107. At the time of the termination hearing, Father's visitation was on hold because Father failed to attend his last scheduled visit.

The record further reveals that Father has been given adequate time to complete the ordered services or, at the very least, to show a substantial step toward the completion of the ordered services. Father, however, has not done so. For instance, Father acknowledged that DCS Case Manager Julie Finn has yet been able to complete a visit at Father's home and that he was at fault for Case Manager Finn's inability to visit his home. Father also acknowledged that at the time of the termination hearing, he was not compliant with the medication prescribed for his depression. Case Manager Finn testified that Father is hard to contact and does not always return her calls regarding services in a timely matter.

In addition, with respect to Father's ongoing drug use, the record reveals that Father did not consistently submit to drug screens, despite the fact that he was aware that the failure to do so resulted in a positive test result. Further, Father tested positive on numerous occasions when he did submit to drug screens. The positive drug screens included positive test results for cocaine, heroin, marijuana, morphine, and other opiates. The juvenile court heard testimony that there were no circumstances, such as Father having something in his mouth at the time of the test, which could result in a false positive for cocaine, heroin, or their derivatives. While the record reveals that Father did begin attending a substance abuse treatment program approximately a month and a half before the termination hearing, Father missed as many sessions as he attended.

Furthermore, while the record indicates that the juvenile court considered the evidence presented by Father in support of the progress that he claimed to be making, it is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assign the same weight to the testimony as Father. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*. We conclude that the evidence, when considered as a whole, is sufficient to demonstrate a reasonable probability that the reasons for M.P's removal from and placement outside Father's care will not be remedied. Father's claim to the contrary

effectively amounts to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

Under these circumstances, we cannot say that the juvenile court erred in determining that DCS established that it is unlikely that the conditions resulting in M.P.'s removal from and continued placement outside Father's care would be remedied. *See In re C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997). Having concluded that the evidence was sufficient to support the juvenile court's determination, and finding no error by the juvenile court, we need not consider whether the continuation of the parent-child relationship poses a threat to M.P.'s well-being because DCS has satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence. As such, we affirm the judgment of the juvenile court.

The judgment of the juvenile court is affirmed.

RILEY, J., and ROBB, J., concur.