## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
May 08 2015, 9:07 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Mark Small
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of T.T. & J.T., Minor Children, and Their Mother, C.T.,

C.T.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

May 8, 2015

Court of Appeals Case No. 49A02-1410-JT-733

Appeal from the Marion Superior Court
The Honorable Marilyn A. Moores, Judge
The Honorable Larry Bradley, Magistrate
Lower Court Cause Nos. 49D09-1402-JT-96, 49D09-1402-JT-97

## Bradford, Judge.

# Case Summary

[1] Appellant-Respondent C.T. ("Mother") appeals the juvenile court's order terminating her parental rights to T.T. and J.T. (collectively, the "Children"). On June 26, 2012, Appellee-Petitioner the Indiana Department of Child Services ("DCS") filed a petition alleging that the Children were children in need of services ("CHINS"). The CHINS petition stated that DCS became involved with the family and the Children were removed from Mother's care because Mother was unable to provide the Children with a safe, stable, and appropriate living environment. On July 10, 2012, the Children were adjudicated to be CHINS, following Mother's admission to this effect. Mother was subsequently ordered to participate in certain services. Although Mother participated in the court-ordered services, Mother was unable to progress to a point where the service providers could recommend reunification.

[2] DCS filed a petition seeking the termination of Mother's parental rights to the Children on February 26, 2014. Following a two-day evidentiary hearing, the juvenile court issued an order terminating Mother's parental rights to the Children. On appeal, Mother contends that DCS did not provide sufficient evidence to support the termination of her parental rights. We affirm.

# Facts and Procedural History

[3] Initially, it is of note that Mother has an extensive history with DCS. DCS first became involved with Mother in September of 2009, when it filed a petition

alleging that T.T., who was born on October 24, 2003, and Mother's other child, S.T.,[1] were CHINS. In this petition, DCS alleged that T.T. and S.T. were CHINS because Mother's home "was observed to be in [a] deplorable condition with excessive clutter and cockroaches." DCS Ex. 2, p. 4. The petition also alleged that T.T. had "significant burns" on his body with "at least one of these burns left untreated." DCS Ex. 2, p. 4. The juvenile court adjudicated T.T. and S.T. to be CHINS on October 26, 2009. Approximately eight months later, DCS reported that Mother had completed all services and recommended that the case be closed.

[4] DCS again became involved with Mother in November of 2010, after receiving a report of potential child abuse or neglect. At the time, Mother's home was found to be in "disarray, with numerous items laying about the house" and T.T. was observed to have "a mark under his left eye that was approximately [two] inches long and [one] inch wide, with observable lines. DCS Ex. 17, p. 44. As a result of the concerns raised by the report, Mother was entered into a six-month Informal Adjustment. The informal adjustment was successfully closed on May 6, 2011.

[5] J.T. was born to Mother June 22, 2012. A few days after J.T.'s birth, DCS again became involved with Mother. On June 26, 2012, DCS filed a petition alleging that the Children were CHINS. In this petition, DCS alleged that the

---

[1] Mother's parental rights to S.T. are not at issue in the instant appeal.

Children were CHINS because Mother had failed or was unable to provide the Children with a safe, stable, and appropriate living environment. Specifically, DCS alleged that Mother's home "was observed to be unsanitary for the [Children] due to the infestation of roaches and ants, and the home was in disarray." DCS Ex. 21, p. 57. DCS further alleged that Mother was "also being evicted from her home, and she [had] not secured other housing that [was] appropriate for the [Children]." DCS Ex. 21, p. 57. Furthermore still, DCS alleged that medical professionals had expressed concern about mother's ability to care for her newborn baby, J.T., in light of Mother's mental health issues.

[6] Following an initial hearing on DCS's petition, the juvenile court, over DCS's objection, allowed for placement of the Children with Mother so long as Mother participated in services and met other requirements. However, the next day, on June 27, 2012, before J.T. was released from the hospital into Mother's care, Mother took T.T. to DCS due to a lack of appropriate housing.

[7] The juvenile court adjudicated the Children to be CHINS on July 10, 2012, following Mother's admission that she lacked "appropriate housing for the children at this time and therefore, the [Children] are [CHINS]." DCS Ex. 27, p. 91-95. On July 10, the juvenile court issued a dispositional order and parental participation decree in which it ordered Mother to participate in home-based counseling and to complete a parenting assessment. The juvenile court also ordered Mother to complete all services recommended as a result of the parenting assessment. Following an April 30, 2013 review hearing, the juvenile

court authorized a trial home visit pending positive recommendations from the service providers. The Children were subsequently removed from the trial home visit after safety concerns arose.

[8]     On February 26, 2014, DCS filed a petition seeking the termination of Mother's parental rights to the Children. The juvenile court conducted an evidentiary termination hearing on August 11 and September 15, 2014. During the termination hearing, DCS introduced evidence relating to concerns regarding Mother's continued inability to provide proper care for the Children. Specifically, DCS introduced evidence which demonstrated that although Mother initially made some progress in services, her progress eventually stagnated; Mother was unable to demonstrate that she could consistently handle the Children during visits; Mother's cognitive abilities negatively affected her ability to recognize the Children's needs and to effectively parent the Children; and Mother would require presently unavailable significant and permanent continued support in order to parent the Children. DCS also introduced evidence indicating that the termination of Mother's parental rights was in the Children's best interest and that its plan for the permanent care and treatment of the Children was adoption. Mother, for her part, presented evidence which she claimed demonstrated that she loved the Children, had made progress in services, and was willing to continue to try to learn how to appropriately care for the Children. Following the conclusion of the termination hearing, the juvenile court issued an order terminating Mother's parental rights to the Children. Mother now appeals.

# Discussion and Decision

The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id.* Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

Mother contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating her parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination*

*of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

[12] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[13] In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following exists:
>
> > (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
> >
> > (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
> >
> > (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or

probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B)  that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)  termination is in the best interests of the child; and

(D)  there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2011).  Mother does not dispute that DCS presented sufficient evidence to support the first, third, and fourth elements set forth in Indiana Code section 31-35-2-4(b).  Mother, however, does claim that DCS failed to establish the second element that is required to be proven before a court can order the involuntary termination of a parent's parental rights.  Specifically, Mother argues that DCS failed to establish either that (1) there is a reasonable probability that the conditions that resulted in the Children's removal from or the reasons for the Children's continued placement outside of her home will not be remedied, or (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children.

# Conditions Resulting in Removal Not Likely to Be Remedied

On appeal, Mother argues that DCS failed to establish by clear and convincing evidence that the conditions resulting in the Children's removal from and continued placement outside her care will not be remedied. Mother also argues that DCS failed to establish by clear and convincing evidence that the continuation of the parent-child relationship poses a threat to the Children. However, it is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find *either* that the conditions resulting in removal from or continued placement outside the parent's home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the children. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where, as here, the juvenile court concludes that there is a reasonable probability that the conditions which resulted in the removal of the children from or the reasons for the continued placement of the children outside of the parent's care would not be remedied, and there is sufficient evidence in the record supporting the juvenile court's conclusion, it is not necessary for DCS to prove or for the juvenile court to find that the continuation of the parent-child relationship poses a threat to the children. *In re S.P.H.*, 806 N.E.2d at 882.

In order to determine whether the conditions will be remedied, the juvenile court should first determine what conditions led DCS to place the Children outside of Mother's care or to continue the Children's placement outside

Mother's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[16] Here, the juvenile court determined that DCS presented sufficient evidence to prove that it was unlikely that the reasons for the Children's removal from and

continued placement outside of Mother's care would be remedied, and upon review, we conclude that the juvenile court's determination to this effect is supported by the record. In support of its determination, the juvenile court found as follows:

> 12. [T.T.] has been diagnosed as Moderately Mentally Disabled, and he has Post Traumatic Stress Disorder. At the time the [CHINS] was filed he had a history of being aggressive and violent, with hitting, kicking and biting. He would not follow directions, had a severe speech difficulty using growls instead of verbalizing, and had toileting issues.
>
> 13. [T.T.'s] formal education at this time is at one hour per day at an alternative IPS school. Prior, due to his behavior, he had been placed in home bound education with a teacher coming to the home.
>
> 14. [T.T.'s] foster parents work with [him] at least two days a week with educational computer programs.
>
> 15. [T.T.] is also receiving speech and occupational, therapy at his school.
>
> 16. Physically, other than being obese, [T.T.] has an intestinal problem. He has a fiber diet and toileting schedule to combat this.
>
> 17. [J.T.] was a newborn when the [CHINS] case commenced. He has not been tested for any developmental disabilities but appears to have, at the least, a verbal problem.
>
> 18. Foster parents placed [J.T.] in First Steps. [Mother] does not believe anything is wrong with [J.T.], nor does he need therapy. While placed with her, [Mother] failed to engage with First Steps.
>
> 19. After [J.T.'s] trial in home visitation with his mother, he came back to the foster parents growling and making little eye contact. He "ranged" for any food he could get.
>
> 20. The [Children] progress in the care of their foster parents but appear to regress after visits, or during in-home placement, with their mother.
>
> 21. [J.T.] does not wish to go to his mother and does not have a strong bond with her.

22. [T.T.] and [J.T.] have been observed as having a strong bond.

23. Services were ordered and referred for [Mother] to successfully complete toward reunification. [Mother] has actively participated in services, some of which continues at this time.

24. [Mother] has a cognitive disability which impairs her parenting skills. She is concrete in her thinking.

25. At the beginning of the [CHINS] case, [Mother] underwent a Family Functioning Assessment, with the exception of a Child Abuse Potential Inventory which [Mother] did not appear to understand and complete.

26. As part of the assessment, [Mother] completed the AAPI-2 Inventory designed to assess parenting and child rearing attitudes and indications of risks. [Mother] scored low in appropriate expectations of a child, empathy, and parent-child role reversal. She scored mid-range as to corporal punishment beliefs and children's power and independence.

27. Travis Nelson, with Life Solutions, worked as a therapist with [Mother] all through the [CHINS] case, working eight to ten hours per week at the peak of his services. After working with [Mother] for over two years he still feels she would need support, probably professional, on a daily basis to parent her children.

28. Mr. Nelson believes that at this time there are still safety issues, and [Mother] still lacks in areas of intervention, following through with discipline, appropriate diet, and consistency.

29. Although [T.T.] is obese and has special dietary needs, [Mother] does not present as an appropriate model with her diet and has trouble implementing his special diet.

30. Mr. Nelson also has concerns regarding educational neglect with [Mother] not able to navigate [T.T.'s] school needs or the boy's homework.

31. Services providers throughout the [CHINS] case have expressed [the] concerns that Mr. Nelson has.

32. Jessica Hynson, of Adult and Child, commenced therapy with [T.T.], as well as therapy sessions with [T.T.], [J.T.], and [Mother] in April of 2014. She last saw [Mother] approximately one month prior to this trial.

33. Ms. Hynson has concerns for [Mother's] parenting skills in lack of affection, not being able to disciple, her lack [of] positive reinforcement, and interaction with both boys.

34. As a result of [T.T.'s] violent outbursts and trouble at school which appeared to co-relate to visits with his mother, Ms. Hynson started recommending decreased visitation. [T.T.] did better after visits decreased.

35. [Mother] received significant support from her mother. She also received support from a neighbor and her church. [Mother's] mother died the month prior to the pending [CHINS] case, [Mother] no longer wants the neighbor's support, and she has been asked to refrain from attending church until the boys' situation is over.

**\*\*\*\***

37. Stable, sanitary and appropriate housing has been inconsistent. [Mother] has resided in her current residence for approximately two months. It has been observed as having clutter and trash throughout.

**\*\*\*\***

40. [Mother] participated in extensive services for over two years to the point that she has reached her capacity and no other services are available to help in her reunification effort.

41. At the time of trial in this matter, no service provider, family case manager or Guardian ad Litem could recommend reunification. Additional time will not bring reunification.

**\*\*\*\***

43. There is a reasonable probability that the conditions that resulted in the [Children]'s removal and continued placement outside the home will not be remedied by their mother. After prior case services and with the current [CHINS] case being open for well over two years, major parenting concerns remain to be overcome prior to reunification. [Mother] loves her children and has fully engaged in referred services, but due to unfortunate cognitive deficiencies and [a] lack of a daily support system, she cannot make the progress to ensure an appropriate home and meet the [Children]'s needs. It is not a case of trying but is a question of an ability that [Mother] does not have.

Appellant's App. pp. 21-23. In light of these findings, the juvenile court concluded that DCS had established by clear and convincing evidence that the reasons for the Children's removal from and continued placement outside Mother's home would not be remedied. Specifically, the juvenile court concluded as follows:

> There is a reasonable probability that the conditions that resulted in the [Children]'s removal and continued placement outside the home will not be remedied. After more than two years of active participation in services, [Mother] still lacks the insight and skills needed to furnish the [Children] with a safe, appropriate home free of neglect, and be able to effectively meet educational, emotional and physical needs.

Appellant's App. p. 24.

[17] In challenging the termination of her parental rights, Mother does not challenge any of the specific findings of the juvenile court. Mother argues, however, that "[i]f a parent loves her children, but has intellectual difficulties such that those children are removed from her care and custody, DCS should provide services sufficient to achieve reunification. [Mother] tried to respond to services. She loves her children. Termination was not supported by the evidence." Appellant's Br. p. 12.

[18] No one disputes that Mother loves her children. However, the unchallenged findings made by the juvenile court demonstrate that despite Mother's love for her children, she has been unable to progress to a point where the service providers involved in this matter could recommend reunification. Mother

acknowledges that the juvenile court was required to evaluate her fitness to care for the Children at the time of the evidentiary hearing together with her habitual patterns of conduct. The above-quoted findings indicate that the juvenile court did so before reaching the conclusion that the circumstances leading to removal from and requiring continued placement outside of Mother's home would not be remedied. Furthermore, while the record indicates that the juvenile court considered the evidence presented by Mother regarding the progress in learning how to care for the Children that she claimed to be making, it is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assign the same weight to the testimony as Mother. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*.

[19] We conclude that the evidence, when considered as a whole, is sufficient to demonstrate a reasonable probability that the reasons for the Children's removal from and placement outside Mother's care will not be remedied. Mother's claim to the contrary effectively amounts to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

[20] Under these circumstances, we cannot say that the juvenile court erred in determining that DCS established that it is unlikely that the conditions resulting in the Children's removal from and continued placement outside Mother's care

would be remedied. *See In re C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997). Having concluded that the evidence was sufficient to support the juvenile court's determination, and finding no error by the juvenile court, we need not consider whether the continuation of the parent-child relationship poses a threat to the Children's well-being because DCS has satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence. As such, we affirm the judgment of the juvenile court.

[21] The judgment of the juvenile court is affirmed.

Vaidik, C.J., and Kirsch, J., concur.