A. S. C. CORPORATION *v.* FIRST NATIONAL BANK OF ELWOOD ET AL.

[No. 29,965. Filed June 1, 1960. Rehearing denied September 20, 1960.]

Jeremiah L. Cadick, Floyd W. Burns, James M. Nicholson, Cadick & Burns, of counsel, all of Indianapolis, John E. Scott and O'Neill, Scott & Schrenker, of counsel, of Anderson, for appellant.

Hugh E. Reynolds, Locke, Reynolds, Boyd & Weisell, of counsel, of Indianapolis, and Robert L. Austin, of Anderson, for appellee First National Bank of Elwood.

Lee B. Fidler, of Anderson, for appellee, Walter F. Busch.

BOBBITT, J.—This case comes to us on petition to transfer from the Appellate Court under Acts 1933, ch. 151, §1, p. 800, being §4-215, Burns' 1946 Replacement. See: A. S. C. Corporation v. First National Bank of Elwood (1959), 161 N. E. 2d 179.

Appellant conducts a finance business consisting of the loaning of money to retail automobile dealers by what is commonly known as a "floor plan" arrangement, and the purchase from them of conditional sales contracts taken by such dealers to secure the balance of the retail selling price, and by the acceptance of chattel mortgages to secure certain other loans on automobiles.

This action was brought to recover damages allegedly suffered by appellant as a result of the non-payment of certain loans made to appellee, Cecil L. Slavens, by the

appellant. Such loans were secured by (1) trust receipts on new and used automobiles intended for resale under a floor plan arrangement; (2) chattel mortgages on automobiles; and (3) conditional sales contracts of appellee, Slavens.

The theory of this action as stated by appellant is that it was induced to make such loans by fraudulent concealment and misrepresentations by the defendants-appellees, Cecil L. Slavens (hereinafter referred to as "Slavens"), The First National Bank of Elwood (hereinafter referred to as the "Bank"), and Walter F. Busch (hereinafter referred to as "Busch"), of the failing and insolvent financial condition of appellee, Slavens, the alleged dishonest and improper banking and business practices carried on by appellees, Slavens, Bank and Busch, and the facts concerning the priority of the liens taken by appellant on certain automobiles of Slavens.[1] Such concealments and misrepresentations are alleged to have been made pursuant to a fraudulent conspiracy among the appellees, Slavens, Bank and Busch, the purpose and effect of which was to induce appellant to make such loans to Slavens so that the funds so advanced would be available for use in the satisfaction of indebtedness of appellee, Slavens, to appellee, Bank.

Trial was by the court without the intervention of a jury. Finding and judgment was for defendant-appellee, Bank, and defendant-appellee, Busch, and against defendant-appellee, Slavens, in the sum of $61,485.24, with interest and costs.

The issues presented by the motion for a new trial—the sole specification of which is that the "decision of

---

1. Because of the conclusion which we have reached, we deem it unnecessary to consider appellees' contention that recovery here is barred by the statute of fraud, Acts 1 R. S. 1852, ch. 42, §6, p. 299, being §33-103, Burns' 1949 Replacement.

the court is contrary to law"—is whether the alleged fraudulent acts of concealment and misrepresentation of material facts were committed by appellees, Bank and Busch, pursuant to a conspiracy to which they were a party and, if so, whether appellant was misled by such acts and suffered damages as a result thereof.

The sole assignment of error is the overruling of appellant's motion for a new trial; and the only question presented for our consideration is whether or not the decision of the trial court was contrary to law.

The decision of the trial court comes to us clothed with the presumption that a correct result was reached and the burden is upon appellant here to overcome that presumption. *Souerdike* v. *State* (1952), 231 Ind. 204, 206, 108 N. E. 2d 136.

Appellant had the burden of proof to establish the material allegations of its complaint by a preponderance of the evidence. If the evidence here entitled appellant to the relief denied it, the decision of the trial court was contrary to law. In determining that question, however, "we may consider only the evidence most favorable to the successful party, and it is only where the evidence is without conflict and leads to but one reasonable conclusion, and the trial court has reached a contrary conclusion, that the decision will be disturbed as being contrary to law. *Wilson, Admx.* v. *Rollings* (1938), 214 Ind. 155, 14 N. E. 2d 905; *Rowe* v. *Johnson* (1945), 223 Ind. 289, 60 N. E. 2d 529; *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N. E. 2d 669, and cases cited." *Souerdike* v. *State, supra* (1952), 231 Ind. 204, 206, 108 N. E. 2d 136.

See also: *E. H. Purcell & Co., Inc.* v. *Agricide Corp.* (1956), 126 Ind. App. 476, 134 N. E. 2d 233; *Newton* v. *Cecil* (1955), 125 Ind. App. 416, 421, 124 N. E. 2d 713.

Appellant asserts that the evidence was introduced by plaintiff-appellant; that it was undisputed and uncontradicted, and under "the only reasonable inferences therefrom and the law applicable thereto, appellant was entitled to recover judgment against all of the appellees."

Appellees deny this assertion and contend that the fact that all of the evidence was offered by appellant has no significance in determining its weight and probative value, and that conflicting inferences could have been drawn from the evidence as shown by the record here.

The evidence consisted of oral testimony of witnesses, written documents, an adverse party examination of Busch, a deposition of Slavens, and a stipulation of facts.

Appellant relies upon the rule as reaffirmed in *State ex rel. Board, etc.* v. *Hayes* (1950), 228 Ind. 286, at page 292, 91 N. E. 2d 913, 915, " 'that a *prima facie* case must always prevail in the absence of countervailing proof or in other words where the evidence in the record is all one way its effect becomes a matter of law even in favor of the plaintiff to recover.' "

In further support of its position appellant also cites *Egbert* v. *Egbert* (1948), 226 Ind. 346, 80 N. E. 2d 104; *Taylor* v. *Lohman* (1881), 74 Ind. 418; and *Jamieson* v. *Miller* (1876), 54 Ind. 332.

*State ex rel. Board, etc.* v. *Hayes, supra,* was an action to enjoin the defendant-appellee from practicing medicine without a license. The evidence there was undisputed and uncontradicted that appellee, Hayes, was practicing medicine without a license and under such circumstances the rule as above stated was applicable, and this court properly held (at page 293 of 228 Ind.)

that the trial court had no discretion, but, "as a matter of law, should have granted the temporary injunction."

*Egbert* v. *Egbert, supra,* 226 Ind. 346, at page 352, 80 N. E. 2d 104, 107, also holds that "when a plaintiff has fully sustained each of the material averments of his complaint by uncontradicted evidence, a general finding against him is contrary to law, and will compel a reversal."

Certain early cases do say that there being no conflict in the evidence (54 Ind. 332) or in the testimony (74 Ind. 418) an Appellate Court will weigh the evidence and give it such effect as, in its judgment the trial court should have given it. However, in each of these cases it appears from the respective opinions that the evidence was without conflict and led to but one reasonable conclusion and the trial court had reached a contrary conclusion.

Since these cases were decided, however, our appeal courts have again recognized the fact that uncontradicted evidence will sometimes support conflicting inferences, and when this is the case, the inferences drawn by the trier of the facts will prevail. The rule and the reasons supporting it are ably and fully stated in *Haynes* v. *Brown* (1950), 120 Ind. App. 184, at pages 189-190, 88 N. E. 2d 795, 797-798, as follows:

"The fact that all of the evidence at the trial was offered by the appellant is of no significance in determining its weight. *Wilson, Admx.* v. *Rollings* (1938), 214 Ind. 155, 14 N. E. 2d 905. The trier of the facts is not required to believe the testimony of every witness. *Soucie* v. *State* (1941), 218 Ind. 215, 31 N. E. 2d 1018. On the other hand the trial court may not refuse to consider and weigh competent, uncontradicted evidence. *Egbert* v. *Egbert* (1948), 226 Ind. 346, 80 N. E. 2d 104. . . . And even though an item of evi-

dence is not expressly or directly denied or refuted, it does not necessarily stand as uncontradicted evidence, for the trier may disregard or disbelieve oral evidence if it is considered unreasonable or inconsistent with facts and circumstances shown by the other credible evidence in the case. *Wright* v. *Peabody Coal Co.* (1948), 225 Ind. 679, 77 N. E. 2d 116.

"Nor does a lack of contradiction or dispute in the evidence of itself make us the finders of the facts or justify us in substituting our judgment for that of the trial court. We can only do that when the evidence is all one way, and but one conclusion could be reached from the facts proved, *Wiggam* v. *Rhodes' Estate* (1931), 92 Ind. App. 491, 176 N. E. 250; *Wilson, Admx.* v. *Rollings, supra; Pearson Co., Inc.* v. *Cohen et al., supra;* for uncontradicted evidence will sometimes support conflicting inferences, and when that is the case, the inferences drawn by the trier of the facts will prevail. *Gish* v. *St. Joseph Loan, etc., Co.* (1918), 66 Ind. App. 500, 113 N. E. 394; *Wiggam* v. *Rhodes' Estate, supra; Williams* v. *Bent* (1949), 119 Ind. App. 374, 87 N. E. 2d 883; see also *Clayton* v. *Universal Construction Co.* (1942), 110 Ind. App. 322, 38 N. E. 2d 887, and *Cole* v. *Sheehan Construction Company* (1944), 222 Ind. 274, 53 N. E. 2d 172."

The reason for such rule is readily apparent, and we reaffirm both the reasoning and the conclusions as stated in the above quotation from *Haynes* v. *Brown, supra.*

See also: *Wilson, Admx.* v. *Rollings* (1938), 214 Ind. 155, 158, 14 N. E. 2d 905; *Cole* v. *Sheehan Construction Company* (1944), 222 Ind. 274, 280, 53 N. E. 2d 172; *McKee* v. *Mutual Life Ins. Co. of New York* (1943), 222 Ind. 10, 12, 51 N. E. 2d 474; *Newton* v. *Cecil, supra* (1955), 125 Ind. App. 416, 421, 124 N. E. 2d 713; *Smith et al.* v. *Brown et al., supra* (1956), 126 Ind. App. 545, 555, 134 N. E. 2d 823; *E. H. Purcell & Co., Inc.* v. *Agricide Corp., supra* (1956), 126 Ind. App. 476, 479, 134 N. E. 2d 233.

The above cases, upon which appellant relies, are applicable today only if considered in connection with the later pronouncements as quoted above from *Haynes* v. *Brown, supra* (1950), 120 Ind. App. 184, 88 N. E. 2d 795, and herein reaffirmed by this court. Certainly they cannot be considered as authority that a reviewing court should, or can, weigh the evidence in this case, consisting of answers to interrogatories (an adverse party examination of appellee, Bank, by appellant) an adverse party examination of appellee, Busch, and a deposition of appellee, Slavens, taken by appellant, oral testimony and a stipulation of facts, wholly disregarding the well-established rules of law as stated in *Haynes* v. *Brown, supra,* and hereinabove quoted and reaffirmed.

The evidence most favorable to the appellee as disclosed by the record may be summarized as follows:

Slavens was engaged in business as an automobile dealer near Elwood, Indiana. He financed new automobiles purchased by him in the usual and customary manner of floor planning, by the execution of notes secured by trust receipts.

Appellant floor planned automobiles for Slavens from May, 1953, until August, 1953, at which time a controversy arose regarding an automobile which had reappeared on a trust receipt that appellant had just acquired. When inquiry was made by appellant of Slavens he stated that his bookkeeper had made an error. After refusing to show appellant's agent, Latchaw, the automobile, he (Slavens) paid off appellant in full by giving Latchaw a check in the sum of $20,000, and from that time until January, 1954, Slavens did not finance automobiles on the floor plan with appellant. However, during this same period appellant financed retail sales of automobiles for Slavens on conditional sales contracts or on chattel mortgages. The financial statement sub-

mitted to appellant by Slavens in January, 1954, shows that on January 23, 1954, Slavens was indebted to appellant for loans on demonstrators in the sum of $10,000.

During the period from sometime in August of 1953, when Slavens ceased his floor plan financing with appellant, until such operations were resumed in January of 1954, appellant's representative called upon Slavens, repeatedly and frequently, seeking his business and expressing appellant's desire to again finance automobiles for him on the floor plan.

In December, 1953, Slavens' account was, and had been, overdrawn at appellee, Bank, for a substantial period of time. The financial statement abovementioned shows bank indebtedness in the amount of $20,200. He had repeatedly promised to secure the necessary funds to pay the Bank the amount which it had advanced on checks drawn by him. In each instance he stated that he would get the money, and from time to time did bring in funds to the Bank, and pick up checks he had drawn when he did not have sufficient funds on deposit in the bank to cover them.

From time to time during the latter part of 1953, Busch informed Slavens that the Bank wanted his account cleared. On one of these occasions Slavens informed Busch that he could get a line of credit from appellant, that he had made application for such a line of credit, and about January 21, 1954, Slavens called the manager of appellant and asked him to confirm to Busch that appellant was going to extend a line of credit for the financing of automobiles, and appellant's representative, Mr. Williams, did inform Busch that his company was going to advance on the security of new automobiles (floor plan) a line of credit not to exceed $50,000. Appellant, prior to the extension of this line

of credit, did not check with the Secretary of State to see whether any other company had filed notice that it was financing automobiles on the floor plan[2] for Slavens, but did require of him a financial statement which he signed and filed with appellant. This statement did not disclose that Slavens was floor planning cars with Universal C. I. T. Corporation, or anyone else, at the time (January 23, 1954). C. I. T. Corporation had duly recorded its financing plan with Slavens with the Secretary of the State of Indiana.

The officers of appellant, in determining whether or not they would resume trust receipts financing with Slavens, did not check with the Secretary of State, nor did they ask the Bank for any information concerning Slavens' credit or financial condition. When the line of credit to Slavens was approved in January, 1954, appellant's manager came to Elwood where he personally identified the automobiles covered by the trust receipts, by checking them against the certificate of origin. He also prepared the trust receipt agreement and examined the evidence of titles in Slavens' possession. Such examination did not show that Slavens had already financed some of these cars on a floor plan with C. I. T. Corporation.

Under the trust agreement Slavens was to have possession of the automobiles for the purpose of resale and he agreed to account to appellant for the proceeds of each sale. Neither the Bank nor Busch had anything to do with these transactions. They were completed by appellant and Slavens and a check for the amount loaned was delivered to Slavens by appellant's manager,

---

2. A finance company, when it desires to engage in the financing of automobiles with a dealer on the floor plan with trust receipts, may file notice of its intention so to do in the office of the Secretary of State. Acts 1935, ch. 206, §1, p. 993, being §51-601, Burns' 1951 Replacement. Acts 1935, ch. 206, §13, p. 993, being §51-613, Burns' 1951 Replacement.

and the two then went to the bank where Slavens endorsed the check, previously given him by appellant under the trust receipt agreement, and delivered it to Busch. Appellant's manager, Mr. Williams, then asked Busch if the check "took care" of all the Bank had on trust receipts, and Busch replied that it did. The appellant had no control over what Slavens did with the money after he obtained the loan on security which appellant had accepted as sufficient.

Subsequently it developed that Slavens was double financing automobiles under the floor plan. Appellant has lost a substantial sum by reason of the fact that some of the automobiles on which it had trust receipts had been financed through C. I. T. Corporation prior to appellant's loan.

The parties stipulated that appellant loaned money to Slavens upon notes which were secured by trust receipts. These trust receipts provided, in substance, that Slavens should retain possession of the automobile and upon its sale he agreed to pay appellant the amount loaned on the security of that particular automobile. The amount loaned upon each new automobile under the trust receipt agreement, was the amount paid by Slavens to the factory dealer or distributor and not the retail price. It was also stipulated that Slavens had sold some of the automobiles at retail, which were covered by appellant's trust receipt, but had failed to pay appellant the amount loaned on such cars as security as per his agreement. It was further stipulated that Slavens had previously floor planned some of the automobiles described in appellant's trust receipt with C. I. T. Corporation. Information upon which appellant's trust receipts were prepared was obtained from Slavens, the factory distributor, and the personal ex-

amination by appellant's manager, Mr. Williams, of the automobiles floor planned.

The stipulation also sets out that certain automobiles described therein were sold at retail by Slavens and the purchasers financed the automobiles by conditional sales contracts, which Slavens sold to appellant under an agreement to repurchase on demand.

It was also stipulated that appellant loaned money to Slavens and took a note therefor, secured by chattel mortgage on demonstrator automobiles retained by Slavens and used by him in the conduct of his business. The appellant prepared the note and mortgage on these cars and its district manager, as a notary public, took Slavens' acknowledgment, and also personally checked the automobiles described in the chattel mortgage. Some of these cars were disposed of by Slavens and he did not pay the amount loaned by appellant on the security of such cars as they were sold.

On three demonstrators, on which loans were secured by chattel mortgages, Slavens gave his personal check to appellant drawn upon the Bank for the amount due. Upon receipt of the check and before it had been cleared by the Bank appellant released the chattel mortgage of record, and Slavens thereupon sold the automobile free and clear of the mortgage, and when the check was presented to the bank for payment it was returned unpaid.

In Exhibit "U", attached to the stipulation, and which is a copy of the minutes of a special meeting of the Board of Directors of the Bank, appears the following:

"Mr. Busch stated that he did not get a chance to send checks back within the required limit of time on or about August 19, 1953, totaling $23,-000.00. That the reason why he had let those go past the time was because Mr. Slavens had called him and promised to pay within a week and *that all*

*he, Walter Busch, could do was to try to get Slavens out of the mess,* but Slavens kept on sending checks and stated that unless Walter Busch cashed them C. I. T. would cut him off and that he, Walter Busch, realizing this, took real estate mortgages, called D. P. C. (debts previously contracted) mortgages on Slavens' business and home. On the business he took $25,000.00, on the home $15,000.00. These are second mortgages, first mortgage held by Federal Savings and Loan Association of Elwood, Indiana, in the amount of $6,858.00 on the business and $9,600.00 on the house, and, in addition to this took a chattel mortgage on office equipment, business equipment, excluding bonds, in the amount of $15,000." (Our italics.)

In February of 1954, appellant had some checks of Slavens returned for insufficient funds. The executive vice-president, Mr. Latchaw, and the comptroller of appellant, then went to Elwood to see Slavens. Latchaw testified, on direct examination as a witness for appellant, regarding this incident, as follows:

"Q. What did he tell you?
"A. Well, Mr. Slavens said he expected to receive additional working capital from his distributor, Jones and Maley.
"Q. Were you at his place of business then?
"A. Yes.
"Q. Did he have cars on the floor?
"A. Yes.
"Q. And you were holding some trust receipts?
"A. Yes.
"Q. What did you do then?
"A. We relied on his experience—
"Q. Just what you did.
"A. I think we accepted what he said, and went on."

This evidence clearly shows that appellant was aggressively soliciting Slavens' business, that it took little

or no precaution whatever to ascertain his financial standing, ability to pay, resources, indebtedness or anything else, except such as might appear on the face of the financial statement submitted by Slavens in January of 1954.

There is no evidence that the Bank or Busch assisted Slavens in the preparation of the financial statement which he furnished to appellant or that either the Bank or Busch vouched for its correctness. There is no evidence that appellant made any inquiry of the Bank concerning the financial statement of Slavens, his credit rating or deposit account in the bank. Neither is there any evidence that the Bank had, or claimed to have, any lien upon any of the automobiles described in the trust receipts, conditional sales contracts, or chattel mortgages, executed or assigned by Slavens to appellant. Nor is there any evidence as to what Slavens did with the money paid to him by the purchasers of automobiles which were "floor planned" and financed by appellant.

There is no evidence that the Bank participated in or knew of the double financing of any of the automobiles on which loans were made by appellant to Slavens.

The trial court may reasonably have inferred from the above circumstances that appellant's loss was not caused by any act of Busch or the Bank, or by the failure of either to discharge any duty which they, or either of them, owed to appellant, but rather by appellant's blind and negligent reliance upon Slavens' financial statement, its former business dealings with him, and his experience as an automobile dealer.

As is hereinabove noted, Busch stated that the reason he permitted Slavens' account to be handled in the manner in which it was handled was "to try to get Slavens out of the mess, . . ." Here was direct positive evidence

to explain the conduct of Busch, who was acting for himself and the Bank. He created in this one statement conflict in the evidence which, if believed by the trial court, would explain all his actions on a theory in which intent to deceive or harm appellant for the benefit of the Bank could find no place.

There is also the direct positive testimony of Latchaw, the executive vice-president of appellant, that appellant relied upon Slavens' experience and "accepted what he said, and went on," even after certain checks of Slavens had been returned for insufficient funds.

This was direct evidence of a substantial nature which would support an inference by the trial court that appellant did not rely upon any act or concealment of appellees, Busch or the Bank, in its decision to extend further credit to Slavens, but did rely upon its own appraisal of Slavens' financial standing, his statements and experience.

It is clearly evident from the record here that conflicting inferences could have been drawn from the evidence. The trial court, by its decision, concluded that appellant's loss was not due to any fraudulent acts of concealment or misrepresentation by appellee-Busch or by the Bank. The Appellate Court weighed the evidence and reached a contrary conclusion.

> "Evidence is in conflict when from its consideration, as a whole, both the affirmative and the negative of the issue of fact has support from it." *Larkin* v. *Burlington, C. R. & N. Ry. Co.* (1894), 91 Iowa 654, 60 N. W. 195, 196.

We think not only that conflicting inferences could reasonably be drawn from the evidence in the record here, but that there is also conflict in the direct evidence itself.

If there were, as appellant asserts, any absence of contradiction or dispute in the evidence here, such would not "of itself, make us the finders of the facts or justify us in substituting our judgment for that of the trial court." The fact that all of the evidence here was submitted by the plaintiff-appellant, is of no significance in determining its weight.

The probative value of the evidence in a case depends upon its substance and not upon which party introduces and places it in the record. Frequently a party, in the trial of a case, will submit evidence which he expects and believes will help his cause. However, when this is done such evidence becomes a part of the entire record and is equally available for the benefit of all interested parties, and its use as evidence is not in any way affected by its source. *Wilson, Admx.* v. *Rollings, supra* (1938), 214 Ind. 155, 158, 14 N. E. 2d 905.

The trial court here was the sole judge of the credibility of the witnesses, and the weight to be given documentary evidence; and any conflicts in the evidence or any reasonable inferences which might be drawn therefrom, are to be determined and drawn by him.

We are unable to say that the evidence here is all one way and but one conclusion could be reached therefrom, or that appellant herein is entitled to relief which was denied it.

The decision of the trial court was, therefore, not contrary to law and the judgment must be affirmed.

Judgment affirmed.

Jackson, C. J., Landis, Achor and Arterburn, JJ., concur.

NOTE.—Reported in 167 N. E. 2d 460.