## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Lori B. Schmeltzer
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Michael A. Ksenak
Jarrett T. Ksenak
Ksenak Law Firm
Martinsville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Marriage of:

Deborah D. Skelton,

*Appellant-Petitioner,*

v.

Rodney D. Skelton,

*Appellee-Respondent.*

July 28, 2015

Court of Appeals Case No. 55A01-1412-DR-512

Appeal from the Morgan Superior Court
The Honorable Christopher L. Burnham, Judge
Trial Court Cause No. 55D02-1307-DR-1271

**Bradford, Judge.**

# Case Summary

Appellant-Petitioner Deborah Skelton ("Mother") and Appellee-Respondent Rodney Skelton ("Father") were married in June of 1999. Three children were

born during the course of the parties' marriage. The parties initiated divorce proceedings in 2013. On November 14, 2014, the trial court issued an order dissolving the parties' marriage. The order further provided that Father and Mother shall share joint legal custody of the children, provided that Father shall have primary physical custody of the children, and divided the marital estate. On appeal, Mother challenges the award of primary physical custody to Father and the division of the marital estate. We affirm in part, reverse in part, and remand to the trial court.[1]

## Facts and Procedural History

Mother and Father were married on June 19, 1999. Three children were born during the course of the parties' marriage. J.S. was born on February 9, 2002. Twins B.S. and S.S. were born on February 2, 2007. On July 25, 2013, Mother filed a verified petition seeking dissolution of the parties' marriage. Father filed a verified counter-petition seeking dissolution of the parties' marriage on September 4, 2013.

---

[1] Mother has filed a Motion to Strike certain portions of Father's Appellate Brief, claiming that Father's Brief relies on evidence presented during an October 9, 2013 preliminary hearing in arguing that the trial court's final order was appropriate. Because we were able to complete our review of the trial court's final order without relying on the evidence presented during the October 9, 2013 preliminary hearing, we deny Mother's motion as moot in an order issued simultaneously with this memorandum decision. Further, we cite to the transcript of the October 9, 2013 preliminary hearing in crafting this memorandum decision only so far as is necessary to set forth the facts relating to the procedural history of the instant matter.

# A. Facts Relating to the Trial Court's Preliminary Order

[3] On October 9, 2013, the trial court conducted a preliminary hearing. During this hearing, the trial court heard sworn testimony relating to the issue of custody of the parties' children. The trial court also heard sworn testimony about the parties' financial situation.

[4] With respect to custody of the parties' children, Father testified that over the past year and a half, he had begun acting as the children's primary care-giver. Specifically, Father testified as follows:

> [Mother] started going out a lot more and leading up to her twenty year class reunion she star[t]ed going out with friends, and staying out and that's when really before that, you know, we kind of .. it was 50/50, but within the last year and a half, I've been primary caregiver on getting the kids ready for school and stuff. And she's there when they get off the bus. But most of the time I've made dinner and taken care of them in the evening.

Prelim. Tr. p. 8. Father indicated that Mother would leave the parties' home soon after Father got home from work and would stay out until midnight or after. Father further indicated that

> Most of the time [when] [Mother] got home, I was already in bed. This continued all through the fall of '12. She was going out. And then into the spring of this year it started becoming a regular thing where she was out every Friday and Saturday night. And [ ] most of the time I don't know what time she got home, because I was usually asleep by the time.

Prelim. Tr. p. 9.

In addition to "going out," Mother also started working out. Father indicated that Mother would, at times, leave to work out before he would arrive home from work. With regard to Mother's working out, Father stated that

> I started coming home from work and I would find the kids at the house by [themselves], and I didn't agree with it. And she was working out, which was to improve her health, and I had no problem with her working out, but couldn't understand why she couldn't wait until I got home before she went and worked out. And she said she had to work out at certain times. So I could come home and find the kids at home and she said she's going to work out [at] that time and by the State of Indiana that our oldest son, which is eleven, should be old enough to babysit whenever she seen fit for him to do it.
>
> ****
>
> Usually I'd get home 5:30 to 6:15, and the kids would have been home for roughly a half hour by [themselves]. And then especially in the spring, sometimes she would go to work out and she wouldn't get home till 9, 10, 11 o'clock at night. Other nights she would be home by 7 or 8.

Prelim. Tr. pp. 9-10. In addition, Father testified that on one night, when Mother knew Father was going out with a friend to celebrate the friend's birthday, Father returned home at midnight and found that the kids "were in the house asleep and nobody else was at home." Prelim. Tr. p. 11.

When asked why he should be awarded primary physical custody, Father stated as follows:

> Well, I believe that, you know, I've worked the same job for seventeen years. I show stability. I pay all of the bills. I make sure they're up every morning, they're getting fed. I've made sure for the last year and a half since this all going on that eighty, ninety percent of the time I'm making dinner in the evening. I'm making sure they get baths, doing

laundry. Doing everything around the house. She does .. she does participate some. But I would say the majority of it I do.

Prelim. Tr. pp. 13-14.

[7] At the conclusion of the preliminary hearing, the trial court awarded Father primary physical custody. In making this ruling, the trial court stated the following:

> This is not a final order. This situation is a mess, quite frankly, folks. And there's going to have to be a lot of work done to get to a point where these children are no longer harmed by this situation, so I'm going to do the best I can with what I've got to work with, which isn't much. For now, [Father] is granted primary physical custody of the children. Parties will retain joint legal custody for now for specific decision making.… The purpose of this is to try to minimize the negative impact on the children as much as possible. It's already bad, but .. try to keep things somewhat together for them. So .. that's the best that we can do at this point. And let's see if we can find a resolution down the road fairly quickly for the children's best interest.

Prelim. Tr. pp. 38, 40.

## B. Facts Relating to the Trial Court's Final Order

[8] On November 14, 2014, the trial court conducted a final hearing. During this hearing, the trial court heard sworn testimony relating to: (1) custody of the parties' children, (2) the parties' living arrangements, (3) the parties' employment, (4) the marital residence, and (5) Mother's student loan debt. The trial court also considered Mother's desire to call J.S. to testify during the final hearing.

### i. Testimony Relating to Custody of the Parties' Children

[9] Father testified that "for the last couple of years [Mother] started spending a lot of weekends away" from the family home. Tr. p. 46. In February of 2014, Mother spent at least thirteen nights away from the family home. In March of 2014, Mother spent at least eighteen nights away from the family home. In April of 2014, Mother spent at least fifteen nights away from the family home. In May of 2014, Mother was away from the home for and went twenty days without seeing the children. Also in May, Mother notified Father that she was "no longer going to come home." Tr. p. 47. She stopped helping Father get the children off the school bus and Father had to make other arrangements for help getting the children off the school bus.

[10] Father indicated that he initially requested primary physical custody of the children because of Mother's "going out" and the fact that Father had assumed responsibility for getting the children up, putting them on the school bus, making dinner for the children, feeding them, cleaning the house, etc. Tr. p. 53. Father testified that the transition to him being the primary care giver took place approximately two-and-one-half years prior to the final hearing. Father testified that he does not know where Mother was when she was gone for twenty days, but assumes that she was staying with either her boyfriend or friends. When asked to explain her long absences from the children, Mother claimed she had been very sick. Despite Mother's increasing absence from the family's home, Father does not dispute the fact that Mother is good to the children and that the children love Mother.

[11] Father further testified that he believed that it was in the children's best interest for him to have primary physical custody because:

> Well, I believe that I show stability with the time that I've spent with my job. When it came to hard times, you know, she asked me to leave the house, and I wouldn't abandon my children. And I stayed in the house. And I make sure I'm home with them every evening. And provide with them what they need as far as clothing, as far as food, and .. I haven't left my children before and .. to go .. one of the things with her leaving for twenty days and not seeing the kids, I would never do that to my children. My children mean more to me than anything.

Tr. p. 59.

> Just the stability and you know, the structure they have with me is, you know, they know what they're getting with me. You know, I stay up on their homework and work with them on a daily basis. And I just believe its in the best interest that .. that they see somebody that has stability[.]

Tr. p. 60. Father acknowledged that while both he and Mother have bought clothes for the children, he has paid for school lunches and book rental. Father also stated that he took responsibility for helping the children with their homework and transporting them to their extra-circular activities.

[12] For her part, Mother indicated that she believes that it is in the children's best interest that she be given primary physical custody of the children. In support, Mother claimed to have observed injuries to the children which might potentially indicate physical abuse by Father. For instance, Mother claimed to have observed scratch marks on S.S. and bruises on B.S. Mother, however, failed to present any specific testimony about when she allegedly observed the

scratches and bruises or testimony about how she believed the alleged injuries were inflicted. Mother also cited to a time when J.S. required stitches to his knee. The evidence, however, indicates that the stitches were not the result of any alleged abuse by Father, but rather that J.S. needed the stiches after falling off of a bicycle. The evidence further demonstrates that Father was not present when J.S. fell off the bicycle and hurt his knee. J.S. was in Kentucky at the time with Father's mother and step-father. Like Mother, Father only learned of J.S.'s injury after the fact.

[13]     Mother additionally claims Father has a short temper. With regards to Father's alleged short temper, Mother testified that during the time she had known Father, she had seen him "punch holes in walls, thrown [sic] phones, [] choked [sic] [her], [] [and] threatened [sic] to get a gun and kill himself." Tr. p. 40. Mother, however, did not provide any additional testimony relating to any of these alleged incidents. She also admitted that she never reported any of these alleged incidents to the police.

[14]     For a few months leading up to the final hearing, Mother has exercised parenting time with the children and has had them "every other weekend plus Wednesday overnight." Tr. p. 9. The trial court also heard testimony that the children enjoy close relationships with both Father's extended family and with their maternal grandparents. Father ensures that the children have the opportunity to spend time with both their paternal and maternal grandparents.

### ii. *Testimony Relating to the Parties' Living Arrangements*

At some point after the preliminary hearing, but before the final hearing, the marital residence was sold. Since the marital residence was sold, Father and the children have lived in a home near Hazelwood. The home is located seven minutes from the children's school. Mother resides in a home in Camby. Mother is leasing the home and her rent is $1250.00 per month.

### iii. *Testimony Relating to the Parties' Employment*

Father has been employed at Westgate Chrysler in Plainfield for eighteen years. He is currently the parts manager. His weekly income is approximately $1332.00. Father also has a 401k through his employment. The parties agreed to split Father's 401K, with each party receiving $16,409.00.

Father normally works from 7:30 a.m. to 5:00 p.m. However, on days when the children are with Mother, Father works from 7:00 a.m. to 6:00 p.m. On a normal day, Father gets the children up, feeds them, and drops them off at school each morning before going to work. Father has arranged after school care for the children on Mondays, Mother has the children on Wednesdays, and Father's mother watches the children on Tuesdays and Thursdays. Father anticipates incurring child care expenses during the summers.

At the time of the hearing, Mother was working various jobs, including in a part-time contract position for an order fulfillment group doing data entry and as a real estate agent for Keller Williams. Her combined gross weekly income was $478.00. Mother indicated that she had listed and sold five homes in the

twelve months preceding the final hearing. Mother also indicated that there is no physical or mental impediment that would keep her from working full-time. Mother testified that she holds a bachelor's degree in human relations and business management. She indicated that she could not see any reason why she could not find employment in either of these fields. However, as of the date of the final hearing, Mother had not applied for any jobs in either of these fields.

### iv. Testimony Relating to the Marital Residence

At some point in 2013, Father had to take an approximately $16,000.00 loan out of his 401K to cover bills, including mortgage payments that were behind. Father subsequently took over the responsibility to pay the bills after he learned that Mother wasn't making the necessary payments and that the parties were again falling behind on their mortgage payments.

Again, at some point after the preliminary hearing but before the final hearing, the marital residence was sold. There was "slightly over $10,000[.00] left" after the lien holders were paid from the purchase price. Tr. p. 10. Mother indicated that she believes that the remaining proceeds from the sale of the marital residence should be split between the parties.

### v. Testimony Relating to Mother's Student Loan Debt

With regard to Mother's student loans, Mother graduated from college in 1998 and the parties married in 1999. Nevertheless, Mother believed that her remaining student loan debt should have been split between the parties. Mother agreed to take over the payments but argued that the debt should be attributed

to both parties. Approximately $30,000.00 of Mother's student loans relate to her undergraduate degree. The other $8000.00 loan was for classes Mother took during the parties' marriage. Father testified that he was not aware Mother had taken out the $8000.00 student loan during the course of their marriage.

### vi. Mother's Request to Call J.S. to Testify

[22] Mother requested permission to call J.S. to testify about his wishes. The trial court told Mother that, although he understood that Mother wished for the trial court to talk to J.S., J.S., who was 12 years old, was "too young for [the court] to take his request into consideration." Tr. p. 74. The trial court indicated that once J.S. was older, the court could give J.S.'s wishes "more weight." Tr. p. 74. The court also told Mother that if she believed there was a physical threat to the children in Father's home, she could report her concerns to the Department of Child Services ("DCS"). The court explained that it is not an investigative agency and that DCS would be the appropriate agency to investigate and claims raised by Mother. The trial court warned Mother, however, that she should not share accusations which she knew to be false with DCS.

## C. The Trial Court's Final Order

[23] Following the conclusion of the final hearing, the trial court issued its final order on November 18, 2014. The trial court ordered that Mother and Father shall share joint legal custody of the children and that Father shall have primary

physical custody of the children. The trial court noted that the parties had been working under an agreed parenting time arrangement. The trial court ordered that the parties should continue to collaborate regarding parenting time by Mother with the children with the goal of balancing parenting time by both parents in a manner that does not disrupt the children's education or health needs. In addition, Father was ordered to obtain medical insurance for the children and the parties were ordered to alternate tax deductions for the children, per their agreement. The trial court did not impose an obligation to pay child support upon Mother. The trial court noted that the parties agreed to split the balance of Father's 401k evenly, with each receiving $16,409.00.

[24] With respect to the division of the parties' assets and liabilities, the trial court attached a proposed division of the parties' assets and debts that was submitted by Father to its final order. This proposed division read as follows:

|  | To [Mother]: | To [Father]: |
| --- | --- | --- |
| Total Assets to Party: | $26,049.57 | $24,503.56 |
| Total Debts to Party: | $1,887.00 | $22,230.00 |
| Subtotal: | $24,162.57 | $2,273.56 |
| Equalization Payment: | -$10,944.51 | $10,944.51 |
| TOTAL DISTRIBUTION: | $13,218.06 | $13,218.07 |
| Net percentage award: | 50% | 50% |

Appellant's App. p. 10. This appeal follows.

# Discussion and Decision

[25] On appeal, Mother contends that the trial court (1) abused its discretion in granting primary physical custody to Father, (2) erred in denying her request to call J.S. as a witness, and (3) erred in dividing the marital estate. We will discuss each of Mother's contentions in turn.

## A. Award of Primary Physical Custody

[26] On appeal, we review a trial court's custody order under an abuse of discretion standard of review. *Wiggins v. Davis*, 737 N.E.2d 437, 440 (Ind. Ct. App. 2000). We will consider only the evidence favorable to the trial court's judgment and we will not reweigh the evidence nor review the credibility of the witnesses. *Id*. "We are reluctant to reverse a trial court's determination concerning child custody unless the determination is clearly erroneous and contrary to the logic and effect of the evidence." *Id*.

*Macher v. Macher*, 746 N.E.2d 120, 123 (Ind. Ct. App. 2001).

[27] Mother argues that the trial court erroneously relied on the testimony presented during the preliminary hearing and its preliminary custody determination in making the final custody determination. We disagree, observing that the parties presented evidence relating to the best interests of the children during the final hearing. Indiana Code section 31-17-2-8 provides that a trial court shall determine custody and enter a custody order in accordance with the best interests of the children.

In determining the best interests of the child[ren], there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:

(1) The age and sex of the child[ren].

(2) The wishes of the child[ren]'s parent or parents.

(3) The wishes of the child[ren], with more consideration given to the child[ren]'s wishes if the child[ren] is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child[ren] with:

    (A) the child[ren]'s parent or parents;

    (B) the child[ren]'s sibling; and

    (C) any other person who may significantly affect the child[ren]'s best interests.

(5) The child[ren]'s adjustment to the child[ren]'s:

    (A) home;

    (B) school; and

    (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child[ren] [have] been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

Ind. Code § 31-17-2-8. In reviewing whether the trial court abused its discretion in awarding primary physical custody to Father, we will review the evidence presented during the final hearing as it relates to each of the above-stated factors.

### i. The Age and Sex of the Children

[28] With respect to the age and sex of the children, the trial court heard testimony during the final hearing that J.S., a boy, was twelve years old. B.S., a boy, was seven years old. S.S., a girl, was also seven years old. The parties did not present evidence suggesting that the children's ages and gender have any effect on either parent's ability to provide for the children.

### ii. The Wishes of the Children's Parents

[29] With respect to the parties' wishes, the trial court heard testimony that both Father and Mother wanted primary physical custody of the children. The trial court also heard evidence relating to why each parent believed that it was in the children's best interests for that parent to have primary physical custody.

### iii. The Wishes of the Children

[30] With respect to the wishes of the children, Mother claims that the trial court committed reversible error by denying her request for the trial court to speak to J.S., in camera, regarding his wishes. For the reasons set forth more fully in Section B. below, we disagree.

[31] In denying Mother's request for the trial court to speak to J.S., the trial court correctly noted that the children's wishes would require greater consideration once the children were older. However, given the ages of the children, twelve, seven, and seven, we find that the trial court was not required to give significant consideration to the children's wishes.

### iv. The Children's Interactions and Relationships

[32] With respect to the children's interactions and interrelationships of the children with their parents, the trial court heard evidence indicating that both parents love their children and seem to have a good relationship with the children. Further, there is no evidence to suggest that the children have anything other than a close relationship with each other. With respect to the children's interactions and interrelationships with other people who may significantly affect the children's best interests, the trial court heard evidence indicating that the children enjoy close relationships with both their maternal and paternal grandparents. The trial court also heard evidence that while Mother has a strained relationship with her father, Father ensures that the children have the opportunity to spend time with both their maternal and paternal grandparents. Given that the children seem to have good relationships with both of their parents and with each other, Father's willingness to ensure that the children continue to enjoy a close relationship with both their maternal and paternal grandparents seems to be a distinguishing consideration.

### v. The Children's Adjustment

[33] With respect to the children's adjustment to their home, school, and community, the record demonstrates that the children would continue to live in their current home if Father were granted primary physical custody. As such, the children would not have to adjust to a new school or community if they were to continue to reside with Father. Mother, for her part, indicated that she would also try to keep the children in their current school if she were awarded

primary physical custody.  It appears, therefore, that the children would remain in the same school, at least for the time being, regardless of which parent they lived with.

### vi.  The Parties' Mental and Physical Health

[34]   There is no evidence in the record that either of the parties suffer from any current mental or physical ailment.  In addition, there is no evidence in the record that any of the children suffer from any current mental or physical ailment which would require special care.

### vii.  Pattern of Domestic Violence

[35]   Mother attempted to argue that there was a pattern of domestic violence by Father.  However, the evidence presented by Mother during the final hearing fell short of proving that Father had previously engaged in any domestic violence on any member of the family.  In addition, Father testified that he had never abused any of his children.

### viii.  De Facto Custodian

[36]   There is no evidence that the children had been cared for by a de facto custodian.

### ix.  Other Relevant Factors

[37]   In addition to evidence relating to the above-discussed statutory factors, the parties also presented evidence relating to what we consider to be other relevant factors.  First, the trial court heard evidence that for some time leading up to the

final hearing, Father was acting as the children's primary caretaker. The evidence demonstrates that most days, Father got the children up, fed them, got them ready for school, took them to school, fixed them dinner, transported them to their extra-circular activities, helped them with their school work, and got them ready for bed. Father had assumed this role even before Mother moved to a separate residence as Mother spent a substantial amount of time away from the home and the children. In addition, the trial court heard evidence which demonstrated that Father was in a more economically stable position than Mother.

### x. *Award of Primary Physical Custody of the Children to Father*

[38] Upon balancing each of the above-stated factors, we cannot say that the trial court abused its discretion in determining that the factors weigh in favor of Father being awarded primary physical custody of the children. Mother's claim to the contrary effectively amounts to an invitation for this court to reweigh the evidence, which we will not do. *See In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). Furthermore, it is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assign the same weight to the testimony as Mother. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*. Because we conclude that the trial court acted within its discretion in

determining that it is in the children's best interest for Father to be awarded primary physical custody of the children, we affirm the trial court in this regard.

## B. Denial of Mother's Request for the Trial Court to Speak to J.S.

[39] Mother also contends that the trial court abused its discretion in denying her request to either call J.S. as a witness during the final hearing or for the trial court to conduct an in camera interview with J.S. Initially, we note that Mother acknowledges on appeal that it was "unclear whether Mother, a [then] pro se litigant, was requesting to call J.S. as a witness to testify, or if she was requesting an in camera interview of J.S., or both, and/or in the alternative."[2] Appellant's Br. p. 31. However, regardless of whether Mother requested to call J.S. as a witness or that the trial court conduct an in camera interview of J.S., we find that any potential error in denying Mother's request was—at most— harmless because J.S. was at an age where the trial court was not required to give great consideration to J.S.'s wishes.

[40] Again, at the time of the final hearing, J.S. was twelve years old. Indiana Code section 31-17-2-8 provides that more consideration should be given to a child's

---

[2] In requesting the trial court speak with J.S., Mother stated the following: "Okay. And I do have my son here. I beg on the .. the Court's mercy that he just wants to be heard. I don't know .. in private[.]" Tr. p. 74. When asked for what purpose J.S. wanted to be heard, Mother replied: "To tell you his wishes and what he wants. He just wants to be heard and feel like he has some say." Tr. p. 74.

wishes "if the child is at least fourteen (14) years of age." As such, even assuming J.S. did testify or notify the court that he wished to live with Mother, the trial court did not have to give J.S.'s wishes great weight.[3]

## C. Division of the Marital Estate

[41] Mother also contends that the trial court erred in dividing the marital estate.

> When reviewing a claim that the trial court improperly divided marital property, we must decide whether the trial court's decision constitutes an abuse of discretion. *Keller v. Keller*, 639 N.E.2d 372, 373 (Ind. Ct. App. 1994), *trans. denied*. We consider only the evidence most favorable to the trial court's disposition of the property. *Id*. We will reverse only if the result is clearly against the logic and effect of the facts and the reasonable inferences to be drawn therefrom. *Id*.

*Capehart v. Capehart*, 705 N.E.2d 533, 536 (Ind. Ct. App. 1999).

[42] Indiana Code section 31-15-7-4(b) requires the trial court to divide marital property in a just and reasonable manner.

> The court shall presume that an equal division of the marital property between the parties is just and reasonable. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:
>
> > (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

---

[3] The trial court correctly informed Mother that once a child reaches the statutorily mandated age, the trial court can give the child's wishes more weight.

(2) The extent to which the property was acquired by each spouse:

    (A) before the marriage; or

    (B) through inheritance or gift.

(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to:

    (A) a final division of property; and

    (B) a final determination of the property rights of the parties.

Ind. Code § 31-15-7-5. "Marital property includes property owned by either spouse prior to the marriage." *Capehart v. Capehart*, 705 N.E.2d 533, 536 (Ind. Ct. App. 1999) (citing Ind. Code § 31-15-7-4(a)(1)). "Marital property also includes both assets and liabilities." *Id*. (citing *Dusenberry v. Dusenberry*, 625 N.E.2d 458, 461 (Ind. Ct. App. 1993)).

### i. Mother's Student Loans

Mother claims that the trial court erred by not including her student loans as a marital debt. We agree.

Although the trial court did not make any specific findings relating to Mother's student loans, the testimony during the final hearing indicates that Mother

incurred $31,073.00 in student loans prior to the parties' marriage and $8122.00 during the course of the parties' marriage. With regard to the $8122.00 student loan debt that was incurred during the parties' marriage, we conclude that the debt should have been included in the marital estate. This debt was acquired during the course of the parties' marriage and, if Mother had completed her course work, the degree earned by Mother would have benefited both Mother and Father.

[45] We also conclude that the $31,073.00 student loan debt that was incurred prior to the parties' marriage should have been included in the marital estate. In *Capehart*, the trial court elected not to include the Appellant's student loans in the marital estate because the debt "was not a marital debt because [the Appellant] had incurred the debt before the marriage in order to finance his higher education." 705 N.E.2d at 536. Upon review, we concluded that the trial court's failure to include the student loan debt into the marital estate was error because "[l]iabilities incurred by one spouse prior to the marriage are marital property subject to division by the court."[4] *Id*. at 537 (citing Ind. Code § 31-15-7-4; *Dusenberry*, 625 N.E.2d at 461).

---

[4] We further concluded, however, that the error was harmless because it was apparent from the trial court's findings that the trial court believed an unequal allocation of the parties' debts was justified. *Id*. However, notwithstanding this conclusion, we nevertheless directed the trial court on remand "to amend the dissolution decree in a manner consistent with our holding that the [student loan] debt is marital property and that an unequal division of the marital property is just and reasonable." *Id*.

Like in *Capehart*, we conclude that trial court's failure to include the student loan debt into the marital estate was error because "[l]iabilities incurred by one spouse prior to the marriage are marital property subject to division by the court." *Id*. (citing Ind. Code § 31-15-7-4; *Dusenberry*, 625 N.E.2d at 461). On remand, we direct the trial court to amend the dissolution decree in a manner consistent with our holding that Mother's student loan debt should be included in the marital estate. Further, we observe that because the trial court did not make specific findings regarding its division of the parties' marital estate, it is unclear whether the trial court believed that an unequal allocation of the parties' debts was just and reasonable. If the trial court believes that the student loan debt should be attributed only to Mother and that an unequal division of the marital estate is just and reasonable, the trial court should enter findings to that effect.

### ii. IRA Loan

Mother also challenges the inclusion of the IRA loan as a debt of the marital estate. In challenging the trial court's inclusion of the IRA loan as a debt of the marital estate, Mother claims that the trial court erred in including the IRA loan because "there is no supporting evidence that this is a loan that must be repaid back." Appellant's Br. p. 40. However, with respect to the IRA loan, we observe that even if we were to assume it was error to include it as a debt of the marital estate, Mother invited that error.

"The doctrine of invited error is grounded in estoppel and precludes a party from taking advantage of an error that he or she commits, invites, or which is

the natural consequence of his or her own neglect or misconduct." *Balicki v. Balicki*, 837 N.E.2d 532, 541 (Ind. Ct. App. 2005) (citing *Witte v. Mundy ex rel. Mundy*, 820 N.E.2d 128, 133 (Ind. 2005)). Here, Mother listed the IRA loan, which, at the time, had a balance of $17,561.00, on the marital balance sheet that she filed in the trial court. *See* Petitioner's Ex. 1. The marital balance sheet represented Mother's proposed division of the marital property. In listing the IRA loan, Mother proposed that the debt should be assigned to Father. In addition, Mother also testified during the hearing that, at the time of the final hearing, the parties' debts included the IRA loan. Thus, under the circumstances, we conclude that Mother cannot seek reversal or reconsideration of the property distribution with respect to the IRA loan. *See Balicki*, 837 N.E.2d at 541.

### iii. Equalization Payment

[49] Mother last claims that the trial court erroneously ordered her to make a $10,944.51 equalization payment to Father. For his part, Father argues that although the trial court adopted his proposed division of the marital estate with regard to the parties' assets and liabilities, the trial court did not order that Mother pay the equalization payment reflected on Father's proposed division of the marital estate. Father concedes that he did not request an equalization payment. In fact, he specifically testified during the final hearing that he was not asking the trial court to order Mother to "provide [him] with .. with any money at all." Tr. p. 66.

We note that it is somewhat unclear whether the trial court intended to order Mother to make an equalization payment to Father. While the trial court's dissolution order is silent as to the topic of an equalization payment, Father's proposed division of the marital estate, which was attached to the order for the purpose of setting forth the ordered division of all of the parties' assets and debts, included a $10,944.51 equalization payment. The inclusion of Father's proposed division of the marital estate, without alteration or modification, would seem to suggest that the trial court did intend to order Mother to make an equalization payment. Therefore, on remand we direct the trial court to specify whether it intended to order Mother to make an equalization to Father, despite Father's express testimony that he did not want Mother to be ordered to do so. If the trial court intended to order an equalization payment from Mother to Father, we direct the trial court to issue findings to that effect as well as findings demonstrating that it considered any potential tax consequences that would result from ordering Mother to make such a payment. *See* Ind. Code § 31-15-7-7 (providing that "[t]he court, in determining what is just and reasonable in dividing property under this chapter, shall consider the tax consequences of the property disposition with respect to the present and future economic circumstances of each party").

# Conclusion

In sum, we affirm the trial court's award of primary physical custody of the children to Father. We also affirm the trial court's denial of Mother's request

for the trial court to speak to J.S. However, with respect to the trial court's division of the marital estate, we reverse the trial court and remand the matter to the trial court for further findings consistent with this memorandum decision.

[52] The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions.

May, J., and Crone, J., concur.