## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Antony Garza
Warsaw, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of: J.P. & A.P, Minor Children and Their Mother, L.P.,

L.P.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

November 16, 2015

Court of Appeals Case No. 92A03-1505-JT-399

Appeal from the Whitley Circuit Court

The Honorable James R. Heuer, Judge

Trial Court Cause Nos.
92C01-1409-JT-19
92C01-1409-JT-20

**Bradford, Judge.**

# Case Summary

Appellant-Respondent L.P. ("Mother") appeals the juvenile court's order terminating her parental rights to J.P. and A.P. (collectively, the "Children"). On or about December 20, 2011, the Department of Child Services ("DCS") filed a petition alleging that the Children were children in need of services ("CHINS"). Given Mother's admission, the Children were adjudicated to be a CHINS. DCS subsequently filed a petition seeking the termination of Mother's parental rights. Following an evidentiary hearing, the juvenile court issued an order terminating Mother's parental rights to the Children. On appeal, Mother contends that DCS did not provide sufficient evidence to support the termination of her parental rights. Concluding otherwise, we affirm.

# Facts and Procedural History

The Children were born to Mother and N.N. ("Father") on September 19, 2011.[1] The Children were born premature at twenty-seven weeks and their medical condition at birth was fragile. J.P. was diagnosed with hydrocephaly,[2]

---

[1] The termination of Father's parental rights is not at issue in this appeal. To the extent possible, we will therefore limit our discussion to Mother.

[2] Hydrocephaly "is a condition in which the primary characteristic is excessive accumulation of fluid in the brain. Although hydrocephalus was once known as 'water on the brain,' the 'water' is actually cerebrospinal fluid (CSF) — a clear fluid that surrounds the brain and spinal

which causes him physical and cognitive limitations. J.P. has a shunt to drain water from his brain to his abdominal cavity. He also was diagnosed with cortical-visual impairment causing blindness, a seizure disorder, and lasting chronic lung issues. J.P. requires "constant awareness" by an adult. Appellant's App. p. 18. A.P. was "a very tiny baby" and required a heart monitor. Tr. p. 142. "[T]here were many concerns about her development." Tr. p. 142. The Children remained hospitalized after their birth with J.P., the more medically fragile of the two, being treated at Riley Children's Hospital for a "couple" of months after his birth. Tr. p. 142.

[3] On December 6, 2011, DCS received a report from Dupont Hospital alleging that Mother was acting erratically with A.P. The report indicated that Mother had a history of mental health problems and was diagnosed with bipolar and schizophrenia early in her pregnancy. Mother had previously been committed to Parkview Behavioral Health and indicated that she was hearing voices "which is what sent her to Parkview after the pregnancy of the twins." State's Exs. 28, 36. The report further indicated the following:

> Nursing Staff stated that [Mother] has problems taking initiative with the babies and you have to repeat and redirect her often. There were allegedly many instances in the hospital where

cord. The excessive accumulation of CSF results in an abnormal widening of spaces in the brain called ventricles. This widening creates potentially harmful pressure on the tissues of the brain." http://www.ninds.nih.gov/disorders/hydrocephalus/detail_hydrocephalus.htm (last visited October 29, 2015).

nursing staff had to intervene and show [Mother] how to appropriately care for [A.P.]. [Mother] reportedly ignored all advice the nurses provided to her and she usually responded with profanity. Other days [Mother] would appear appropriate and was able to provide [A.P.] with the care she needed. There are concerns regarding the mental stability of [Mother] and her ability to care for her special needs twins.

State's Exs. 28, 36.

[4] DCS conducted an assessment, during which Mother admitted that she was overwhelmed in caring for the Children and wanted DCS's help. Mother acknowledged that the Children were "very high-need", that she had a history of mental illness, and, at the time, she was not receiving services. Tr. p. 122.

[5] On December 20, 2011, DCS filed verified petitions alleging the Children to be CHINS. The juvenile court subsequently found the Children to be CHINS following Mother's admission to the allegations set for in the CHINS petitions. As a result of the CHINS determinations, on March 12, 2012, the juvenile court conducted a dispositional hearing. At the conclusion of this hearing, the juvenile court ordered Mother to participate in certain services and for the Children to remain in Mother's care. However, on April 27, 2012, the Children were removed from Mother's care because it was determined that Mother was unable to care properly for the Children's special needs. During an April 30, 2012 detention hearing, the juvenile court determined that the removal of the Children was necessary to protect the Children and that it was in the best

interests of the Children to be removed from the home environment and placed in foster care.

[6] On September 18, 2014, DCS filed petitions seeking the termination of Mother's parental rights to the Children. On November 25, 2014, the juvenile court suspended Mother's visitation with the Children because of Mother's inconsistent visitation, which she had ended the month prior, and concerns about the Children's safety during visitations with Mother.

[7] The juvenile court conducted an evidentiary termination hearing on January 29, and March 5, 2015. During the evidentiary hearing, DCS introduced evidence of concerns regarding Mother's continued inability to provide proper care for the Children. Specifically, DCS introduced evidence which demonstrated that in the approximately three years since the children had been removed from her care, despite being offered numerous services, Mother had failed to progress to a level where service providers believed Mother could adequately care for the Children.

[8] On April 16, 2015, the juvenile court issued an order terminating Mother's parental rights to the Children. This appeal follows.

# Discussion and Decision

[9] The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further,

we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the children's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

[10] The purpose of terminating parental rights is not to punish the parent but to protect the children. *Id.* Termination of parental rights is proper where the children's emotional and physical development is threatened. *Id.* The court need not wait until the children are irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[11] Mother contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating her parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the

evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

[12] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[13] In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

(A) one (1) of the following exists:
(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
(B) that one (1) of the following is true:

(i) There is a reasonable probability that the
conditions that resulted in the child's removal or the
reasons for placement outside the home of the
parents will not be remedied.
(ii) There is a reasonable probability that the
continuation of the parent-child relationship poses a
threat to the well-being of the child.
(iii) The child has, on two (2) separate occasions,
been adjudicated a child in need of services;
(C)  termination is in the best interests of the child; and
(D)  there is a satisfactory plan for the care and treatment of the
child.

Ind. Code § 31-35-2-4(b)(2) (2011).  Mother does not dispute that DCS
presented sufficient evidence to support the first, third, and fourth elements set
forth in Indiana Code section 31-35-2-4(b)(2).  Mother, however, claims that
DCS failed to establish the second element that is required to be proven before a
court can order the involuntary termination of a parent's parental rights.
Specifically, Mother argues that DCS failed to establish either that (1) there is a
reasonable probability that the conditions that resulted in the Children's
removal from or the reasons for the Children's continued placement outside of
her home will not be remedied, or (2) there is a reasonable probability that the
continuation of the parent-child relationship poses a threat to the well-being the
children.

# I. Conditions Resulting in Removal Not Likely to Be Remedied

On appeal, Mother argues that DCS failed to establish by clear and convincing evidence that the conditions resulting in the Children's removal from and continued placement outside her care will not be remedied. Mother also argues that DCS failed to establish by clear and convincing evidence that the continuation of the parent-child relationship poses a threat to the Children. However, it is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find *either* that the conditions resulting in removal from or continued placement outside the parent's home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the children. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where, as here, the juvenile court concludes that there is a reasonable probability that the conditions which resulted in the removal of the children from or the reasons for the continued placement of the children outside of the parent's care would not be remedied and there is sufficient evidence in the record supporting the juvenile court's conclusion, it is not necessary for DCS to prove or for the juvenile court to find that the continuation of the parent-child relationship poses a threat to the children. *In re S.P.H.*, 806 N.E.2d at 882.

In order to determine whether the conditions will be remedied, the juvenile court should first determine what conditions led DCS to place the Children outside of Mother's care or to continue the Children's placement outside

Mother's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying the children's removal or continued placement outside their parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for the children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[16] Here, the juvenile court determined that DCS presented sufficient evidence to prove that it was unlikely that the reasons for the Children's removal from and

continued placement outside of Mother's care would be remedied, and upon review, we conclude that the juvenile court's determination to this effect is supported by the record. In support of its determination, the probate court found as follows:

12. After removal of the children on or about April 27, 2012, the children were never returned to parents' care and custody.

13. [J.P.] is described as a happy-go-lucky child. He suffers from hydrocephaly, Cortical Visual Impairment (CVI), hypertension, chronic lung issues, and seizure disorder. [J.P.] must be positioned correctly throughout the day to avoid acid reflux or aspirations. [J.P.] has a G-tube and has transitioned to a blended diet.

14. [J.P.] requires special assistance when eating, and those who feed [J.P.] must be trained to do so.

15. [J.P.] is legally blind, and therapist Linda Tonkel testified that [J.P.] requires "constant awareness" by an adult.

16. [J.P.] attends therapy and school throughout the week, and his care requires a very structured routine, which includes periods of stretching. [J.P.]'s care requires extensive equipment, and he has braces for his legs.

17. The foster mother testified that [J.P.]'s daily routine and schedule is not easy to maintain.

18. [A.P.] is described as a headstrong, happy child. The foster mother testified that [A.P.] requires a highly structured day. [A.P.] suffers from a speech impediment, for which she is currently receiving services.

19. Testimony by the foster mother indicated that the children are very close and have developed a strong bond. [J.P.] recognizes and is aware of [A.P.], and he smiles and laughs when she is around. [A.P.] is protective of [J.P.].

20. Dr. David Lombard assessed and diagnosed Mother's mental health condition in two sessions: the first session was held January 10, 2014, and the second session was held on July 25, 2014.

21.     Dr. Lombard testified that Mother has mental health diagnoses, which include major depressive disorder, personality disorder, and current marital problems.

22.     Dr. Lombard testified that Mother disclosed a lengthy history of battling depression.

23.     In regards to his diagnosis of Mother's current marital problems, Dr. Lombard indicated she was living with her husband, who had expressed a desire to divorce her yet they remain in the same home, while "literally in the same bed." Dr. Lombard expressed concern regarding the understood living arrangement should Mother and Step-Father divorce.

24.     Dr. Lombard testified that Mother's conditions could improve but that the treatment program would require significant effort on her part.

25.     Given Mother's mental health diagnoses, Dr. Lombard did not believe Mother would have the capacity to focus on and effectively care for her special needs children at this time. Dr. Lombard's recommendation was that if Mother continues visits with the children, that they be supervised.

26.     Dr. Lombard indicated that Mother's recommended treatment program would include such things as individual therapy, medication management, dialectical behavioral therapy (DBT), and marital counseling.

27.     Dr. Lombard testified that Mother's treatment program could take as long as nine (9) months, but he would then recommend a post-assessment to determine the level of Mother's benefit from treatment.

28.     In the underlying CHINS case, Mother has been provided with individual therapy with Elizabeth Leffler through the Bowen Center, medication management with Dr. [Santosh] Maharjan at the Bowen Center, DBT through the Bowen Center, and marital counseling with Haley Carpenter through the Bowen Center.

29.     On February 24, 2014, this Court ordered Mother to schedule an appointment with a psychiatrist for medication management and to follow all recommendations of the psychiatrist with regard to medications prescribed.

30.     Mother has been seeing Dr. Santosh Maharjan, board certified psychiatrist, at the Bowen Center since April 2014.

31.     Dr. Maharjan has been asked to participate in the diagnosis and treatment of Mother's condition, and he confirmed that Mother suffers from a mood disorder.

32.     Dr. Maharjan testified that Mother was inconsistent with her appointments and missed a two-month follow-up appointment recommended by Dr. Maharjan.

33.     Dr. Maharjan testified that Mother stopped taking Zoloft, her medication prescribed by Dr. Maharjan, without consulting Dr. Maharjan.  Mother stopped taking the medication altogether and did not table down her prescription as would have been recommended had Mother discussed this with Dr. Maharjan.

34.     Dr. Maharjan testified that mood symptoms can be worsened when medication is stopped altogether rather than tabled down appropriately.

35.     Dr. Maharjan saw Mother at an appointment in December 2014, at which time Mother indicated she had started taking her medication to do so because she had been ordered to do so at court two (2) weeks prior to the appointment.

36.     Mother's individual therapist, Ms. Leffler, testified that Mother's anxiety, stress level, and depression has greatly improved since October 2014.

37.     Ms. Leffler admitted in testimony that a contributing factor to Mother's anxiety, stress, and depression improvement could be the fact that Mother has not cared for or visited with the children since November 2014.

38.     Mother and Step-Father also began seeing a therapist at Bowen Center, Haley Carpenter, in April 2012, in an effort to help them better communicate in their marriage.

39.     Mother and Step-Father ended therapy with Ms. Carpenter in August 2013 because they had reached maximum benefit.

40.     Initially, Mother displayed affection inappropriately in the presence of Ms. Carpenter during therapy sessions.  Once this topic was discussed with Mother, Mother's behavior improved.

41. When therapy started, Ms. Carpenter testified that Step-Father was very defensive of Mother, and Step-Father's relationship to Mother was more loyal. Over time, Ms. Carpenter noted that Step-Father became less loyal and defensive of Mother.

42. [Family Case Manager ("FCM") Gina] Greenawalt testified that she understood that Step-Father had filed for legal separation and had gained full custody of the couple's son, [Ja.P.].

43. Throughout the duration of this case, testimony reflected instances in which Step-Father would indicate he was filing for divorce from Mother.

44. [FCM] Greenawalt attempted to locate a service provider that would teach Mother how to properly and safely feed [J.P.], but she was unable to locate a service provider that would work with and train Mother. This was due to safety concerns for [J.P.].

45. Mother has also received assistance from CHOICES since 2013, and CHOICES offered Mother certain services, particularly in regards to locating a service provider that would teach Mother how to feed [J.S.].

46. Jessica Soto from CHOICES testified that she contacted First Steps, Loving Care, Turnstone, and Riley Children's Hospital in an attempt to find someone willing to train Mother to feed [J.S.], but no service provider was willing to train Mother.

47. Ms. Soto testified that [J.S.] had progressed further in his feedings than Mother's capabilities permitted, and this was why service providers were unwilling to train Mother to feed [J.S.].

48. Ms. Soto testified that if Mother had been trained to feed [J.S.] at her level of ability, [J.S.]'s progress would have suffered a setback.

49. Lisa Coville, pediatric occupational therapist, testified that she had assisted the children in therapy at Mother's home. She refused to train Mother how to feed [J.S.] because Mother was unable to grasp less significant concepts in therapy, such as holding the child's head, and was unable to maintain focus on the children during therapy with Ms. Coville. Due to the

potential safety hazard Mother's feeding would pose for [J.S.], as well as the liability that may result to her own professional license, Ms. Coville was unwilling to attempt to train Mother how to feed [J.S.].

50.    DCS made every effort to locate a service provider and provide training to Mother in an effort to teach her how to feed [J.S.] but was unable to locate one willing to train Mother.

51.    Mother had attended all medical appointments at which [J.S.']s feeding needs and means were discussed, but service providers did not feel she was ready for that responsibility at the time.

52.    Ms. Soto testified that she had concerns regarding Mother's lack of follow through with court-ordered services.

53.    Mother had supervised visitations with her children throughout the duration of the case.  There was a brief time in which Mother had unsupervised visitation with [A.P.], which was halted when Mother alleged that [A.P.] had been sexually abused in her home during an unsupervised visit.

54.    Mother had supervised visitation through both the Bowen Center and Lifeline for a period of time throughout the underlying CHINS matter regarding the children.  The visits with Lifeline were designed to be more therapeutic in nature, in which a therapist would observe and offer assistance and re-direction to Mother when necessary in an effort to assist her in developing parenting skills.

55.    Mother suspended her own supervised visits with Lifeline on October 10, 2014.

56.    Mother's supervised visits with the Bowen Center were suspended by order of the Court on November 25, 2014.

57.    Two employees of the Bowen Center, Brian Adams and Brandon Gage, testified as to their experience supervising visits between Mother and the children.

58.    Both Brian Adams and Brandon Gage indicate that they witnessed positive interactions between Mother and the children and that she often had activities for the children to participate in, such as singing, dancing, and painting.  Brian Adams testified that [J.P.] is unable to actively participate in such activities.

59.     Brian Adams supervised visits between Mother and the children from June 2014 to July 2014.  He noted several instances in which Mother's interaction with the children caused him concern, including:

    a.     Mother would give [J.P.] a toothbrush with toothpaste and walk away from him, causing concern that [J.P.] would poke himself in the eye;

    b.     Mother had videotaped a portion of the visit, even though Mother had been made aware that this is a violation of the rules for such visits;

    c.     Mother often left the children unattended;

    d.     During a visit, Mother has written in her communication journal and has even read aloud from that communication journal;

    e.     Mother has dragged [J.P.] across the floor backwards by his arms.

60.     Brandon Gage supervised visits between Mother and the children from August 2014 to November 2014, at which point supervised visitations ceased.  He noted several instances in which Mother's interaction with the children caused him concern, including:

    a.     Mother tried to stand [J.P.] up without using his leg braces;

    b.     Mother put [J.P.] in what was called a mother's pose in which he was face down with his knees drawn to his chest and arms straight out, causing concern because this was a position Mother was not trained to use with [J.P.];

    c.     Mother gave [J.P.] a gummy bear, causing concern because [J.P.] was not to ingest food by mouth;

    d.     Mother once showed [A.P.] how to plug something into a light socket, causing concern because [A.P.] is still very young and may hurt herself in she learns to stick items into light sockets.

61.     Shannon Brady from Lifeline supervised visits between Mother and the children from May 2014 to October 2014, at

which point Mother ceased her own supervised visitations with the children. Shannon Brady testified that Mother viewed the visits as play dates.

62.　　Near the end of Ms. Brady's supervision of Mothers visits with the children, Ms. Brady noted that Mother appeared increasingly angry and was passively frustrated regarding the supervised visitation.

63.　　Lisa Coville, pediatric occupational therapist, was providing the children with therapy in Mother's home, as well as foster parents' home. After approximately six months working with [A.P.], Ms. Coville determined that [A.P.] no longer needed her services. Ms. Coville continued to work with [J.P.] until he turned three (3) years of age in September 2014.

64.　　However, in November 2013, Ms. Coville filed a letter with this Court indicating that her time was better spent, and [J.P.]'s needs better met, in the home of the foster parents.

65.　　During therapy sessions in Mother's home, Mother would focus on items of therapy which [J.P.] had already achieved. For instance, "[a]fter 5 months and repeated reminders that [Mother] need not hold Joseph's head while working on sitting skills, she continued to do so, hampering his development progress."

66.　　In an effort to focus her attention on progress for [J.S.]'s sake, Ms. Coville decided to stop therapy sessions in Mother's home and only continue therapy in the home of the foster parents.

67.　　Linda Tonkel, formerly of Lifeline, supervised therapeutic visits between Mother and the children every other week for approximately six (6) to ten (10) visits. Ms. Tonkel's visits ended in April or May 2014. She noted several instances in which Mother's interaction with the children caused her concern, including:

　　　a.　　Mother suggested that [J.P.]'s head be shaved, despite the fact he has a shunt in the back of his head that is medically fragile and must be handled with care;

　　　b.　　Mother once acknowledged to Linda Tonkel that she is aware that [J.P.] must sit up straight after

eating so as not to aspirate but almost immediately began swinging [J.P.] up and down after eating;

c.     Mother often used inconsistent discipline with [A.P.] or would speak to [A.P.] at a level beyond the child's understanding and age;

d.     Mother often had difficulty assessing and meeting the needs of the children, particularly [J.P.], and seemed overwhelmed;

e.     In regards to changing diapers, Mother would not address specific needs at specific times. When one child's diaper need to be changed, they were both changed, whether or not there was a need;

f.     Mother had to be redirected to speak to [A.P.] in an adult-voice so as to help her with [A.P.]'s speech problems;

g.     Mother would not accept that [A.P.] would call her foster mother "mommy" and would correct the child indicating that only Mother was "mommy," causing confusion and distress to [A.P.];

h.     Mother was unable to apply the redirection received from Ms. Tonkel in regards to parenting the children, particularly [J.P.].

68.    There were other concerning circumstances in previous visitations between Mother and the children, including Mother often acted as if she believed [J.P.] could see and using inappropriate discipline with [A.P.].

69.    No witness denied that Mother loves the children.

70.    During a meeting regarding [J.P.]'s individual education plan (IEP) in September 2014, Mother expressed that she believed [J.P.] could see blocks.

71.    Mother has allowed [A.P.] to take a pen and write all over Mother's arms and legs, at which time Mother refused the redirection of a service provider, Ms. Soto, to have [A.P.] write on paper rather than on Mother's body.

72.    Mother once called foster mother to report that [J.P.] was having a seizure, at which time foster mother, who is a nurse, came to Mother's home with emergency seizure medication.

Upon entering the home, foster mother witnessed [J.P.] on the floor with Mother, who was rubbing [J.P.]'s legs, looking up at the corner of the ceiling, and yelling the ABC song. Foster mother testified that [J.P.] was not seizing when she arrived at Mother's home but that Mother insisted that foster mother administer the seizure medication to [J.P.] at that time. Foster mother refused.

73. Mother often carries both children at once, which causes concern for the safety of both children because of [J.P.]s tendency to throw his head back suddenly.

74. Mother admitted that she had not been depressed since DCS removed the children from her care back in April 2012.

75. Mother admitted she is prepared for either the return of her children or for the potential termination of her parental rights by this Court.

****

77. On or about June 2, 2014, the Court authorized DCS to proceed with the proceedings to terminate Mother's parental rights. Witnesses testified that Mother has not progressed in her ability to parent the children, and this Court issued an order on Periodic Case Review, in which it noted, "over two years after the removal [Mother] has not made significant progress towards reunification and the modification of the permanency plan to termination is appropriate."

78. As a result of the nature of Mother's lack of any major progress regarding her own mental condition and [J.P.]'s condition, as well as her inability to improve her parenting skills as to both children, DCS Family Case Managers were never able to recommend that Mother and the children be reunified.

Appellant's App. pp. 17-25 (brackets in quotation contained in paragraph 65 and in paragraph 77 in original). In light of these findings, the juvenile court concluded that DCS had established by clear and convincing evidence that the

reasons for the Children's removal from and continued placement outside Mother's home would not be remedied.

[17] In claiming that the evidence was insufficient to support the juvenile court's order terminating her parental rights, Mother specifically challenges only one of the above-stated findings, the finding that Mother has failed to make progress with respect to the services offered to her. Mother argues that the juvenile court's finding is erroneous because the record reflects that through the provided services, she had made some progress in dealing with her mental health issues. In support, Mother points to testimony indicating that she had taken to mindfulness and interpersonal effective skills and enjoyed being able to utilize them. Mother also obtained employment and found that her mindfulness and interpersonal effectively skills were particularly helpful in the workplace. Mother also points to Dr. Maharjan's testimony that Dr. Maharjan did not observe any worsening of Mother's condition and stated that Mother "was doing okay." Tr. p. 18. Mother further argued that the evidence demonstrates that Mother showed a willingness to identify areas requiring improvement and to acquire new skills. While Mother may have made some progress throughout the pendency of the underlying CHINS and termination actions, the juvenile court did not find that Mother had not made any progress, but rather that Mother had not made significant progress towards reunification. This finding is supported by the evidence.

[18] In addition, Mother does not specifically challenge any of the other above-stated findings which demonstrate that, although Mother loves the Children,

she has been unable to progress to a point where the service providers involved in this matter could recommend reunification. These findings, which stand as proven, are supported by the evidence. *See generally, Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) (providing that where a party does not challenge the findings of the trial court, the findings must be accepted as correct).

[19] The evidence demonstrates that the Children were removed from Mother's care on April 27, 2012, after service providers expressed concerns about Mother's inability to meet the Children's special needs. Numerous services were offered to Mother throughout the underlying CHINS proceedings, including visitation, individual and group therapy, marital counseling, home-based services, mental health services, and medication management. While mother participated in most of the services offered to her, Mother's ability to benefit from said services was inconsistent. However, because of concerns relating to Mother's ability and potential liability if Mother were to feed J.P. "incorrectly and something would happen to [J.P.], neither DCS nor the family support worker assigned to work with Mother was able to find a service provider willing to teach Mother how to feed J.P. Tr. p. 128.

[20] FCM Greenawalt testified that Mother "had a lot of peaks and valleys" during the time FCM Greenawalt worked with her. Tr. p. 135. FCM Greenawalt testified that she "had a hard time with [Mother] being consistent.... [S]he would start out so strong and it would be great and we would start to see progress, and then I don't know what would happen, she would kinda taper offer." Tr. p. 137. Mother would initially be "very open and honest about her

concerns" but would later "become very guarded" and would not "want to talk about things" and would not "really [be] willing to progress and almost was defensive." Tr. p. 137. FCM Greenawalt also testified that service providers "really struggled with [Mother] as far as getting her meds stable, as far as having her be consistent." Tr. p. 138. Service providers could not get Mother to "consistently do what she was needed to do as far as following through with those parenting skills that were being taught to her or following through with the coping skills that they were teaching her in her individualized counseling." Tr. p. 137.

[21] In addition, FCM Sharon Persons testified that she did not observe any consistent progress with Mother during the period between November of 2013 and July of 2014. FCM Persons indicated that Mother "would verbally … regurgitate the information, but in the visitation reports and the visitations that [FCM Persons observed], she really could not act upon what she was learning." Tr. p. 147. FCM Persons opined that the Children had been out of the home for over thirty months and, in that time, she had not observed any significant progress "that was being made with [Mother] in meeting the [C]hildren's needs and the safety issues that the [service] providers were reporting." Tr. p. 147. FCM Persons testified that as of the time she stopped working with Mother and the Children in July of 2014, she could not recommend that the Children be returned to Mother's care.

[22] The above-discussed evidence, together with the juvenile court's unchallenged findings, is sufficient to support the juvenile court's determination that the

conditions that led to the Children's removal from Mother's care would not be remedied. Furthermore, to the extent that Mother claims that she presented evidence suggesting that the conditions that resulted in the Children's removal would be remedied, it is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assign the same weight to the testimony as Mother. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*.

[23] Thus, we conclude that the evidence, when considered as a whole, is sufficient to demonstrate a reasonable probability that the reasons for the Children's removal from and placement outside Mother's care will not be remedied. Mother's claim to the contrary effectively amounts to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

[24] Under these circumstances, we cannot say that the juvenile court erred in determining that DCS established that it is unlikely that the conditions resulting in the Children's removal from and continued placement outside Mother's care would be remedied. *See In re C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997). Having concluded that the evidence was sufficient to support the juvenile court's determination, and finding no error by the juvenile court, we need not consider whether the continuation of the parent-child relationship

poses a threat to the Children's well-being because DCS has satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence.

# Conclusion

[25] Having concluded that the evidence is sufficient to support the juvenile court's order terminating Mother's parental rights to the Children, we affirm the judgment of the juvenile court.

[26] The judgment of the juvenile court is affirmed.

May, J., and Crone, J, concur.